IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON ERROL PERCIVAL, et al., | ) | Criminal No. 06-102 (JDB) |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**GOVERNMENT'S NOTICE OF INTENTION TO INTRODUCE
EVIDENCE PURSUANT TO FED. R. EVID. 404(B)**

The United States of America ("United States" or "Government"), respectfully moves this Court, pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"), to permit the introduction at trial of prior misconduct on the part of defendant Wayne Pierre, also known as Ninja ("Mr. Pierre"), and defendant Kevin Nixon, also known as Shaka ("Mr. Nixon"), which is relevant to defendants' intent, knowledge, absence of mistake, motivation, and background of the conspiracy.  In support of its Motion, the Government relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this matter:

I.  BACKGROUND

Defendants Pierre and Nixon are two of twelve Trinidadian nationals who have been indicted in the District of Columbia for Conspiracy to Commit Hostage Taking Resulting in Death and with Hostage Taking Resulting in Death, both charges being in violation of 18 U.S.C. § 1203(a).  According to the allegations of the superseding Indictment, beginning on or about February 1, 2005 and ending on or about April 15, 2005, Mr. Pierre , Mr. Nixon and their co-

conspirators, embarked upon a common plan to obtain the money of American citizen, Balram Maharaj, who was a visitor to the Island of Trinidad and who had relatives there. The conspirators' initial plan was to kidnap Mr. Maharaj's 5-year old son, Dinesh Maharaj, and to hold Dinesh for ransom. However, the conspirators later discarded the initial plan and determined to kidnap Balram Maharaj and sought to obtain a ransom of Mr. Maharaj's money, from Mr. Maharaj's relatives, for his release. On April 6, 2005, in accordance with their plan, Balram Maharaj was abducted and a ransom of $3,000,000 Trinidad (approximately $500,000 US) was demanded for his release. Mr. Maharaj was held captive at a hideout in a mountainous jungle region of Trinidad. On or about April 13, 2005, Mr. Maharaj expired at the remote hideout, as he languished in the hands of the conspirators. Following Mr. Maharaj's death, members of the conspiracy dismembered his body and buried his body parts at another remote location in the mountainous jungle.

In January of 2006, Mr. Maharaj's dismembered and decomposed body was located in a mountainous jungle region in Trinidad.

## II. PROPOSED RULE 404(B) EVIDENCE

The proposed items of evidence admissible under Fed. R. Evid. 404(b) are the following:

**A.    As to Both Defendant Wayne Pierre and Defendant Kevin Nixon**

1. ***The Hostage-taking of Kazim Rahim***. On or about May 4, 2005, at approximately 9:15 pm, victim Kazim Rahim ("Mr. Rahim") was kidnapped at gunpoint from the corner of Sookia Trace and Arranguez Main Road. A grey colored Lancer motor vehicle, displaying registration No. PBE 9667, pulled up next to Mr. Rahim, two men armed with firearms got out of the vehicle and fired shots in the air. The gunmen grabbed Mr. Rahim and

"bungled" him into the grey vehilcle and made good their escape.  The registration displayed on the grey Lancer was the same registration attached by the kidnappers of Mr. Maharaj to the vehicle into which they "bundled" Mr. Maharaj.  As with Mr. Maharaj, Mr. Rahim was taken to a remote jungle hideout, where he, too, was guarded by more than one guard.  As with Mr. Maharaj, Mr. Rahim was blindfolded and bound.  The guards discussed amongst themselves that they had held a number of hostages at this same location and that one of the guards kept an Army belt from one of the hostages, who about a month before, who had been killed there and was buried in the general location of the hideout.  As with Mr. Maharaj, Mr. Rahim attempted to escape from his guards, but was subdued.  Mr. Rahim was beaten and tortured, suffering various wounds, including (but not limited to) a wound that resulted in a scar on his face, and being burned with cigarettes.  At one point, Mr. Rahim was able to see one of his guards, who matched closely the unique description of co-conspirator Zion Clarke.  Mr. Rahim's hostage-takers initially negotiated with Mr. Rahim's relatives/associates a ransom payment of $21,000 TT, which was made to them in two "drops" on or about November 5, 2005.  In addition, Mr. Rahim was forced to travel with certain conspirators to collect a quantity of cocaine that was paid over to the hostage-takers.  However, Mr. Rahim was not thereafter released.  Rather, on May 12, 2005, the hostage-takers demanded payment of $500,000 TT for Mr. Rahim's safe release.  On May 13, 2005, the hostage-takers produced a "proof of life" recording of Mr. Rahim's voice in support of their continuing ransom demand.  At some point in the hostage-taking, Mr. Rahim was moved from the remote jungle location and was relocated and guarded at a dwelling house in Santa Cruz, where his ordeal continued.  On Wednesday, May 18, 2005, Mr. Rahim was able to make good his escape from his guards and the dwelling house in Santa Cruz.

  (a) <u>Mr. Pierre's Role</u>.  Mr. Pierre was a leader of the group that planned and carried out the kidnapping.  Among other things, he oversaw the hostage-taking of Mr. Rahim and was a decision-maker with regard to the ransom negotiations for Mr. Rahim's release and decided where Mr. Rahim would be held while the ransom negotiations were ongoing.  Mr. Pierre received some of the cocaine paid as part of the ransom, which he split with another conspirator.

  (b) <u>Mr. Nixon's Role</u>.  Mr. Nixon was one of the gunmen in the grey Lancer who "snatched," or took hostage, Mr. Rahim.  Among other things, for a portion of the time, Mr. Nixon acted as one of the guards of the victim.  Further, Mr. Nixon took the victim to collect a quantity of cocaine that was part of the ransom payment.

  (c) <u>Others Involved</u>.  Others involved included, but were not necessarily limited to:  Russel Joseph, Jason Percival, Winston Gittens, Kevon Demerieux, and Zion Clarke.

**B.** **<u>As to Defendant Wayne Pierre</u>**

1.  ***The Hostage-taking of Dexter Jagdeo***.  On Thursday, December 16, 2004 at approximately 3:00 pm, victim Dexter Jagdeo ("Mr. Jagdeo") was at his place of business in Curepe, Trinidad, when a white-colored Nissan B-15 motor vehicle drove up occupied by four individuals.  Two armed individuals got out of the Nissan, represented they were Police Officers and displayed what appeared to be a warrant for the arrest of Mr. Jagdeo.  They handcuffed Mr.

Jagdeo and placed him inside of the Nissan and drove away. Mr. Jagdeo was blindfolded and bound. He was taken to the home of Wayne Pierre's father, where he was held. On Friday, December 17, 2004, the hostage-takers contacted a relative of Mr. Jagdeo by telephone and demanded $2,500,000 TT for the safe return of Mr. Jagdeo. During the ordeal, Mr. Jagdeo was fed bread, cheese, water, and juice. Mr. Jagdeo was guarded at all times by at least two guards, but up to three other conspirators would come, at times, to the location where he was held. He was assaulted and interrogated about his access to capitol. Over time, the hostage-takers made numerous ransom calls, inquiring of how much money the family had accumulated. The hostage-takers provided a "proof of life" in the furtherance of the ransom negotiations. On or about December 21, 2004, after a ransom was paid to the hostage-takers, Mr. Jagdeo was released.

    (a)    <u>Mr. Pierre's Role</u>. Mr. Pierre was a leader of the group that planned and carried out the kidnapping. Among other things, he coordinated the hostage-taking crew. He arranged for the use of his father's house as the place where the victim was held. Mr. Pierre was in charge of the distribution of the ransom proceeds to the participants in the kidnapping.

    (b)    <u>Others Involved</u>. Others involved included, but were not necessarily limited to: Russel Joseph, Jason Percival, Winston Gittens, Leon Nurse, Ricardo De Four, Kevon Demerieux, Zion Clarke, and "R.S."

2. ***The Hostage-taking of Robin Ramadar.*** On or about Friday, March 4, 2005, at approximately 8:40 pm, victim Robin Ramadar ("Mr. Ramadar") was taken hostage by three men, armed with firearms, who emerged from a blue-colored motor vehicle, and approached the victim in the area of Cor Branch and Queen Street, in Aranguez, Trinidad. As with the Maharaj kidnapping, one of the gunmen told the victim, it "is you we come for." One of the gunmen struck the victim in the head with a firearm. The victim was "bundled" into a waiting vehicle by his abductors and the vehicle sped away from the scene. The victim was bound and blindfolded and was taken to a remote jungle hideout, where he was held hostage. A series of telephone calls were received demanding ransom, initially $3,500,000 TT, for the safe release of the victim. In support of their ransom demands, the hostage-takers played recorded "proof of life" statements of the victim. Eventually, the hostage-takers reduced their ransom demand to $200,000 TT, and that ransom was paid. On or about March 12, 2005, Mr. Ramadar was located in St. Joseph, Trinidad, bound and blindfolded, and sitting on the side of the road.

    (a)    <u>Mr. Pierre's Role</u>. Mr. Pierre was a leader of the group that planned and carried out the kidnapping. Among other things, on the day of the kidnapping, the other conspirators awaited Mr. Pierre's arrival and final plans prior to driving to the kidnapping location. Mr. Pierre arrived with one of the people ("C.S.") who would act as a "snatcher." Mr. Pierre was one of the people who actually collected the ransom money from the "drop" location along a Trinidadian highway. Mr. Pierre was in charge of distributing the ransom proceeds between himself and the other

conspirators.

(b)  Others Involved.  Others involved included, but were not necessarily limited to:  Jason Percival, Winston Gittens, Ricardo De Four, Leon Nurse, "R.S.," and "C.S."

3.  **The Hostage-taking of Gerald Gopaul.**  On Friday, July 8, 2005, at approximately 7:45 pm, victim Gerald Gopaul ("Mr. Gopaul") was "liming" at a bar called the Diamond Recreation Club in Papouri Village, in San Fernando, Trinidad, when he was approached by four men wearing dark clothing, three of whom were displaying firearms.  Two of the firearms displayed were the same ones used in the Maharaj hostage-taking.  The kidnappers ordered the other patrons to lie down, and they "bundled" the victim into a waiting light-colored Nissan B-15 motor vehicle and made good their escape.  The victim was taken to a wooded area in the Santa Cruz Forest, where he was bound and blindfolded.  The victim was beaten while being held hostage.  A series of ransom calls were initiated by the hostage-takers, demanding a ransom of $500,000 TT for the safe return of Mr. Gopaul.  Eventually, the hostage-takers provided two proof of life recordings in the furtherance of the negotiations.  The sum of $61,500 TT was repeatedly offered to the hostage takers for the safe return of Mr. Gopaul, but this sum was rejected.  At one point in the ransom negotiations (as in the Maharaj hostage-taking), when the victim's relative told the ransom negotiator that the money being offered was all that they had, the ransom negotiator asked the victim's relative "do you love your [relative]?" and, at another point, (similar to Maharaj) told the victim's relative that the relative was "responsible for whatever happens to [the victim.]"  On July 19, 2005, Mr. Gopaul's body was found alongside of Trantrail Road, Valsayn, Trinidad, wrapped in a green plastic sheet.  He was wearing dark

colored pants and had a black plastic bag over his head. Mr. Gopaul's body was in an advanced state of decomposition

    (a)    <u>Mr. Pierre's Role</u>. Mr. Pierre was a leader of the group that planned and carried out the kidnapping. Among other things, he provided the guns used in the kidnapping, which guns were returned to him after Mr. Gopaul had been abducted. Mr. Pierre brought one of the snatchers ("C.S.") to the kidnapping. He coordinated the guards for the victim. Mr. Pierre coordinated the disposal of the victim's body.

    (b)    <u>Others Involved</u>. Others involved included, but were not necessarily limited to: Russel Joseph, Jason Percival, Kevon Demerieux, Zion Clarke, Ricardo De Four, "R.S." "K.P.," and "C.S."

### III. BASIS FOR ADMISSION OF THIS EVIDENCE

Federal Rule of Evidence 404(b) governs the admission at trial of other crimes, wrongs or acts of a defendant. To the extent that it is not intertwined with the charged offenses, evidence of other crimes, wrongs or acts is admissible under Fed. R. Evid. 404(b) if offered for a permissible purpose. It is well-settled that such permissible purposes include proof of intent, motive, opportunity, plan, knowledge, identity or absence of mistake or accident. *See, e.g.*, <u>United States v. Miller</u>, 895 F.2d 1431, 1436 (D.C. Cir.), *cert. denied*, 498 U.S. 825 (1990). "[U]nder Rule 404(b), any purpose for which bad acts evidence is introduced is a proper purpose so long as the

evidence is not offered solely to prove bad character." Id.  Stated differently, the Rule bars admission of such evidence when it is offered for the purpose of proving that a defendant acted in conformity with his character, but allows admission so long as the evidence is offered for *any other relevant purpose*.  See United States v. Lawson, 410 F.3d 735, 741 (D.C. Cir.), *cert. denied*, 546 U.S. 1055 (2005).   In determining whether such evidence is admissible, the Court undertakes a two part analysis.   First, the Court considers whether the evidence is "probative of some material issue other than character."  United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994).  The federal Rule is one of inclusion, not exclusion; the evidence may be offered for any purpose, so long as the evidence is not offered *solely* to prove character.  See United States v. Lawson, 410 F.3d at 741; United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000); United States v. Crowder, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*); United States v. Johnson, 802 F.2d 1459 (D.C. Cir. 1986).  The D.C. Circuit has recognized that "Rule 404(b) evidence will often have . . . multiple utility, showing at once intent, knowledge, motive, preparation and the like." United States v. Crowder, 141 F.3d at 1208.

If the Court deems the evidence to be relevant, the Court should exclude the evidence *only* if its probative value "is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403;  *see also* United States v. Long, 328 F.3d 655, 662 (D.C. Cir. 1993);  United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978).  In close cases, the Rule tilts toward the admission of the uncharged conduct evidence.  See United States v. Johnson, 802 F.2d at 1463-64 ("the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged") (*quoting* United States v. Day,  591 F.2d 861, 878 (D.C. Cir. 1978));  United States v. Morrow, 2005 WL 3159572, *4 (D.D.C. April 5, 2005) (J. Kollar

Kotelly).

Appellate Courts afford "substantial deference" to the District Court's rulings on these issues. *See* United States v. Lawson, 410 F.3d at 741; United States v. Cassell, 292 F.3d 788, 796 (D.C. Cir. 2002) (403 rulings reviewed for "grave abuse" of discretion).

All of the evidence summarized above is highly probative of the Government's theory that these defendants agreed to participate in the kidnapping for ransom of Dinesh Maharaj and ultimately agreed to, and did, participate in the kidnapping of Balram Maharaj in order to obtain from the relatives of Balram Maharaj a ransom for his release, in violation of 18 U.S.C. Section 1203(a). In a conspiracy prosecution, the Government "is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how the illegal relationship between the participants in the crime developed.'" United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000); Morrow, *supra*, 2005 WL 3159572, *6 (citing cases from other circuits).[1] In this case, the defendants' prior association with other members of this conspiracy in the planning and carrying out of other hostage-takings for ransom and their coordinated efforts in furtherance thereof are relevant to inform the jury of the background of the conspiracy charged in

---

[1] *See also* United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.") (*citing* United States v. Lasanta, 978 F.2d 1300, 1307-08 (2d Cir. 1992)); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) ("We have repeatedly held that it is within the court's discretion to admit evidence of prior bad acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."); United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004) ("In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators").

the indictment, and to explain how the defendant came to be involved in the conspiracy and the eventual kidnapping of Balram Maharaj.  The evidence establishes that the defendants were not merely casual acquaintances, or associates from Lower Santa Cruz Forest area, but were active participants in a gang or "crew" that was involved in a criminal enterprise one of the goals of which was to generate monies through the kidnapping for ransom of individuals selected by them.

In United States v. Cheng, No. 97-1016, 1997 U.S. App. LEXIS 33848 (2nd Cir. 1997) (unpublished opinion), the defendant was charged with conspiracy to commit hostage taking in violation of 18 U.S.C. § 371, and the Second Circuit affirmed the admissibility of evidence under Rule 404(b) of the defendant's involvement in a previous uncharged kidnaping "to show the background of [the] conspiracy" and the "relationship of trust" that existed between the defendant and the other conspirators.  *Cheng*, 1997 U.S. App. LEXIS 33848, *3 (*citing* United States v. Araujo, 79 F.3d 7, 8 (2d Cir.), *cert. denied sub nom*, 519 U.S. 888 (1996)).  The appellate court emphasized that evidence of the prior offense was not unduly prejudicial to the defendant because "the uncharged kidnaping was not more sensational or inflammatory than the charged crimes while tending to show how the relationships formed among the conspirators." *Cheng*, at *4 (*citing* United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992)).  Similarly, in this case, the evidence concerning the 2004-05 kidnappings for ransom of Dexter Jagdeo, Robin Ramadar, Kazim Rahim, and Gerald Gopaul are not "more sensational or inflammatory" than the offenses charged in the indictment.  Mr. Jagdeo, Ms. Ramadar, and Mr. Rahim were held for 1-2 weeks and eventually were released; Mr. Gopaul, like Mr. Maharaj, perished while in the conspirators' hands.  However, Mr. Gopaul's body was not dismembered or buried in the jungle

11

to be unearthed some eleven months later in morbid form, rather Mr. Goupaul's body was discarded shortly after his death and was recovered some two weeks after his initial abduction near a roadway, wrapped in plastic. Thus, the potential for undue prejudice from the admission of evidence relating to these other 2004-05 kidnappings minimal, especially if accompanied by an appropriate limiting instruction to the jury.

      The defendants' involvement with these other kidnappings is also highly probative of the defendants' knowledge, intent and motivation at the time they joined the conspiracy charged in the indictment (as to the Jagdeo and Ramadar kidnappings) and the involvement in the two kidnappings subsequent to the kidnapping of Balram Maharaj, are probative that their involvement in the Maharaj kidnapping was not the result of accident, inadvertence, misunderstanding, and/or mistake. The evidence demonstrates that the defendants understood fully nature, extent, and virtually limitless boundaries of the conspirators goals, means, methods, aspirations, strategies, and tactics, at the time they joined and participated in the conspiracy charged in the indictment and the kidnapping for ransom of Balram Maharaj. In United States v. Alvarez, No. 91-50849, 1993 U.S. App. LEXIS 5808 (9th Cir. 1993) (unpublished opinion), a defendant was charged with taking a prison guard hostage in violation of 18 U.S.C. § 1201(a)(5). The trial court permitted the government to introduce evidence of a prior assault by Alvarez involving a baseball bat five years earlier to rebut the defendant's claim that he was acting under duress at the time he committed the hostage taking. The Ninth Circuit affirmed the admissibility of the evidence under Rule 404(b), holding:

> Prior bad acts are admissible to rebut a defense that alleges lack of requisite intent, such as duress. "A prior act can be probative of intent because the fact that the defendant had an unlawful intent at

12

>     the time he committed the extrinsic offense makes it less likely that
>     he had a lawful intent when he performed the acts charged as the
>     present offense." United States v. McCollum, 732 F.2d 1419, 1424
>     (9th Cir.), cert. denied, 469 U.S. 920 (1984).

Alvarez, 1993 U.S. App. LEXIS at 5813-14. See also United States v. Yeung Sun Fu, No. 98-1144, 1999 U.S. App. LEXIS 2189 (2nd Cir. 1999) (since defendant's intent at the time of the hostage taking was in dispute, court properly admitted evidence of other bad acts under Rule 404(b)). The fact that these defendants had an unlawful intent when they engaged in the other kidnapping(s) "makes it less likely" that they had a lawful intent when they joined the conspiracy involving Balram Maharaj in 2005.

At trial in this case, the Government has no intention of presenting lengthy testimony reciting details of the defendants' entire criminal histories. Rather, the Government would expect to call a small number of witnesses who would testify about their involvement in these four other kidnappings that "bracket" the hostage-taking of Balram Maharaj. Many, if not most, of the witnesses would be the same witnesses the Government would call as to the Maharaj kidnapping, in any event. The Government would also present narrowly tailored evidence establishing the defendants' involvement in these other four kidnappings for ransom to show the background of the conspiracy charged in the indictment, as well as the defendants' relationships with other conspirators, their intent, knowledge, and motivation at the time they joined the conspiracy charged in the indictment.

IV.  CONCLUSION

WHEREFORE, for each of the independent reasons set forth above, an application of the legal principles surrounding Rule 404(b) demonstrates that the proffered evidence is probative of relevant issues and ought to be admitted.  As a result, the Government will seek admission of this evidence at the trial.

 Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney

  /S/

By: _____
BRUCE R. HEGYI (D.C. Bar No. 422741)
Assistant United States Attorney
Federal Major Crimes Section
555 Fourth Street, N.W., Room 4848
Washington, D.C.  20530
(202) 305-9637
(202) 353-9414 (fax)
www.bruce.hegyi@usdoj.gov


JEANNE M. HAUCH
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W., 11th Floor
Washington, D.C.  20530
(202) 514-5776