IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 06-102-11 (JDB) |
| v. | |
| CHRISTOPHER SEALEY, | |
| Defendant. | |

## DEFENDANT SEALEY'S REPLY IN COMPLIANCE WITH COURT'S ORDER DATED JULY 17, 2008

The Defendant, Christopher Sealey, by and through his attorneys, Patrick M. Donahue and The Donahue Law Firm, replies to the Government's Response in Compliance with the Court's Order dated July 17, 2008, and states as follows:

**Facts[1]**

The Defendant, Christopher Sealey, was arrested in Trinidad on or about August 1, 2006. During the first week of incarceration his family was denied access to him and he was unable to request that his family secure a lawyer. Subsequently, on August 7, 2006, he was interrogated by Trinidadian authorities.[2] No records have been produced regarding that interrogation. In response to questioning he advised them he had no involvement in the murder/kidnapping of the victim. After a lengthy interrogation wherein Mr. Sealey denied any involvement he was advised he would be charged with murder and kidnapping. He was then returned to his cell and denied visits from family. The following day, August 8, 2006, in the early evening, he was again taken out of his cell for a second interview. He again advised

The Donahue Law Firm
18 West Street
Annapolis, MD 21401
(410) 280-2023

---

[1] All facts are alleged upon information and belief.
[2] On this date Mr. Sealey does not allege that the FBI was present.

Trinidadian authorities he was not involved in the kidnapping and murder of the victim. He also asked to see a lawyer or that his family be told to get a lawyer; instead, police summoned his father, a known drug abuser.[3] The FBI joined the interrogation that followed.[4] It went late into the night. Neither Mr. Sealey nor his father can read or write except with great difficulty. At no time did he agree to waive his right to counsel, in fact, he asked for counsel, to no avail. Ultimately, late in the evening, he was advised that if he and his father signed his father could leave and he would be released the next day. He signed and was charged and has been incarcerated since that time.

## Argument

Given that the FBI was present during much of the interrogation of Mr. Sealey, at least on the second day, he should have been afforded rights under <u>Miranda</u>. He asked for counsel and did not waive his right to counsel. Moreover he was held for days before his August 8, 2006 interrogation. Mr. Sealey could neither read nor write except with great difficulty. After days in custody and hours of interrogation he signed a statement hand written by arresting officers. These carefully orchestrated circumstances had a coercive impact resulting in a statement, written by the arresting officer and not read by Mr. Sealey. Therefore, any statements he allegedly made were not voluntary; rather, coerced by design and not really his statement.

The Defendant Sealey joined in the Defendant Straker's Motion entitled, "Defendant's Second Motion to Compel Discovery", document #207. As noted in the Motion, in order for

---

[3] In stark contrast to the United States, under Trinidadian law, notification of rights can be accomplished by summoning a family member rather than a requested attorney.

[4] Mr. Sealey does not allege that the FBI was present each and every moment of the lengthy interrogation but does submit the Agent was at all times either in the room or right outside the room. Contrary to the Government's submission, Mr. Sealey denies that there was a second interview following the Trinidadian interrogation as suggested in the Government papers; rather, he submits the interrogation occurred just once over a lengthy period in which the FBI was present for the substantial portion. He also submits he never waived his right to counsel. A copy of the FBI 302 is attached as Exhibit 1.

The Donahue Law Firm
18 West Street
Annapolis, MD 21401
(410) 280-2023

2

defendant to have the statements made to Trinidadian authorities suppressed, he must be able to show the existence of a joint venture in the investigation of the kidnapping of Balram Maharaj between Trinidadian officials and those of the United States. See <u>United States v. Bin Laden</u>, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001). On April 14, 2008, in an effort to discover information pertaining to the existence of a joint venture, Co-Counsel Steven Kiersh sent a letter to Assistant United States Attorney Bruce Hegyi seeking the following information. "I am requesting to be provided with copies of any and all correspondence, memoranda, or any other written documentation between the United States and Trinidad/Tobago that relates to the murder of Balram Maharaj." The Government declined to produce such information and Co-Counsel Kiersh's, "Second Motion to Compel," followed immediately thereafter.

It is clear that there was some significant level of cooperation between the United States and Trinidad in the investigation of the kidnapping of Balram Maharaj. Defendant was jointly interviewed by law enforcement on August 8, 2008. Upon information and belief, the FBI has participated in interrogations of many, if not all of the individuals named in the Indictment. In fact, the FBI's involvement has not been fleeting. It appears that the FBI participated with Trinidadian Authorities from the beginning in a coordinated joint effort. For instance, the United States issued a press release to the media in April of 2005 announcing a reward for information about the kidnapping and the suspects. The United States posted in the April 22, 2005 edition of the Trinidad Guardian, the information regarding the reward. In October of 2005 David Suchit was brought to the US Embassy by Trinidadian Authorities to be interviewed by the FBI; this was months before the Indictment. The FBI was present during the discovery of the remains of the decedent and at the autopsy. They were at the

The Donahue Law Firm
18 West Street
Annapolis, MD 21401
(410) 280-2023

prosecution's table during the Trinidadian proceedings. The FBI clearly has had an ongoing presence in Trinidad and seems to have appeared at opportune moments when the suspects have been arrested and the interrogation is beginning. Clearly there is a significant level of cooperation and coordination between the United States and Trinidadian Authorities. It is the Government alone that has the information necessary for the Defendant to establish definitively whether such "joint venture" did indeed exist. To date they resist such inquiry as a fishing expedition; however, reasonable minds could agree that there is the appearance of the existence of such a venture. Moreover, because the evidence related to the agency relationship is entirely within the government's control, Mr. Sealey has no ability to establish definitively the "actual" or "substantial" participation necessary for joint venture without discovery of the cache of information likely contained in the requested, "correspondence, memoranda and any other documentation between the United States and Trinidad/Tobago that relates to the investigation of Mr. Maharaj's kidnapping and murder."

## Conclusion

Accordingly, the Defendant requests that the Court order such production.

Respectfully submitted,

**THE DONAHUE LAW FIRM**

By:   /s/
Patrick M. Donahue, Esq.
Bar No. 358184
18 West Street
Annapolis, Maryland 21401
Telephone: 410-280-2023
Attorney for Defendant, Christopher Sealey

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of July, 2008, a copy of the forgoing Defendant's Reply in Compliance with Court's Order Dated July 17, 2008 was served on all parties by the electronic filing system of the United States District Court for the District of Columbia.

/s/_____
Patrick M. Donahue

The Donahue Law Firm
18 West Street
Annapolis, MD 21401
(410) 280-2023

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   08/24/2006

CHRISTOPHER BOURNE voluntarily agreed to an interview while detained at the Aruca Police Station in Aruca, Trinidad. BOURNE was fully aware of the FBI's presence and he voluntarily agreed to provide a statement to the FBI. Prior to the interview BOURNE executed an enhanced "Notification of Rights" form after he read, initialed, and signed the document at the appropriate locations. SEALEY identified himself as CHRISTOPHER BOURNE of Kingston Avenue and LaCanoa Road, Santa Cruz, Trinidad; Date of Birth: June 23, 1971; Height 5 feet 9 inches; 160 pounds; Dark-Complected; with a beard. BOURNE provided the following information regarding events that led to the kidnap and murder of Balram Bachu Maharaj.

BOURNE's father owns a mini mart food store and while working at the store he received a visit from WAYNE PIERRE, a person he also knows as "Ninja". BOURNE initially met PIERRE in high school at Bourg Mulatresse Roman Catholic School. BOURNE could not recall exactly when PIERRE visited him but he believes it was in January 2005. PIERRE told BOURNE the he (PIERRE) "had some things lined up,";and that "he and his soldiers had some things lined up". PIERRE arranged a meeting for BOURNE to attend the following day at the "Mellow Moods Bar." The following day BOURNE went to the "Mellow Moods Bar" in Bourg Mulatresse. BOURNE noticed that three soldiers and two civilians were at the bar. BOURNE identified one of the civilians as a person he knows only as "Shaka" and he identified the other civilian as PIERRE. BOURNE did not know the three soldiers but he described them as follows: (Soldier#1, tall, slim, dark complected with black hair); (Soldier#2, short, round face, approximately 5'8" tall, brown skin); (Soldier#3 brown/fair skin, 5'8" tall, medium build). BOURNE does not know soldier#3 but recognizes him as the person who was "riding hard" with PIERRE and was thrown out of the defense force. BOURNE has also seen soldier#3 with PIERRE in Bourg Mulatresse.

The discussion at the "Mellow Moods" bar concerned an American soldier who "limes" in Aranguez. Two of the soldiers were saying that they want to kidnap the American soldier for ransom. PIERRE and a soldier specifically asked BOURNE and "Shaka" to kidnap the American soldier. Soldier#3 told BOURNE and "Shaka" that the American soldier is wearing a pink shirt. After discussing the kidnaping plan BOURNE and "Shaka" received instructions to get into a vehicle that had been parked near the bar. BOURNE did not recall the color or make of the vehicle. Upon entering the vehicle BOURNE sat in the back seat on the right side behind the driver and "Shaka" sat in the back seat behind the front passenger. Seated in the same vehicle were an individual BOURNE knows as "Saucy" who sat in the driver's seat and PIERRE who sat in the front passenger seat. In discussing what should occur upon reaching the kidnap location, PIERRE instructed them to allow the first vehicle to make a pass around the bar where the victim is located and park in an area where the occupants can have a full view of the bar. PIERRE also instructed "Saucy" to make a pass around the bar. BOURNE advised that PIERRE exited the vehicle before they departed Aranguez.

BOURNE does not know the name of the bar where the kidnaping occurred; however, upon arriving at the bar he observed the first vehicle drive around the bar and park in an area that provides a full view of the bar. As the first vehicle passed the bar soldier#3, who was alone in the first

| Investigation on | 8/24/2006 | at | Port of Spain, Trinidad |
|---|---|---|---|

File # 256C-MM-106219   Date dictated   8/8/2006

by   ALAT Marvin L. Freeman   Exhibit #1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

(Rev. 10-6-95)

256C-MM-106219

Continuation of FD-302 of __Michael Bourne Sealey__ , On __8/24/2006__ , Page __2__

vehicle, pointed towards the bar and "Saucy" stated "that's the man in there with the pink shirt." Because PIERRE had exited the second vehicle before leaving Aranguez, BOURNE, "Shaka", and "Saucy" were the only occupants of the second vehicle. With "Saucy" driving, the second vehicle drove around the bar and upon making a second approach toward the bar, "Saucy" parked the vehicle across the street from the bar. Shortly thereafter Soldier#3 entered the second vehicle and gave BOURNE and "Shaka" each a gun. Soldier#3 had both guns in his waistband. Soldier#3 gave BOURNE a 9mm pistol and "Shaka" was given a .38 caliber revolver. After providing BOURNE and "Shaka" with guns soldier#3 exited the second vehicle.

BOURNE and "Shaka" exited the second vehicle and went into the bar as "Saucy" remained in the driver's seat. As "Shaka" stood behind the victim, BOURNE approached the victim and stated "we come for you." As BOURNE pointed the gun into the victim's back, the victim stood up and said "not me" and pointed to someone else in the bar. The victim eventually complied with BOURNE's demand and as the victim walked out of the bar with BOURNE and "Shaka", BOURNE kept the gun pointed into the victim's back. When BOURNE and "Shaka" returned to the second vehicle, "Shaka" took control of the victim and placed the victim in the middle of the back seat so that the victim would be seated between "Shaka and BOURNE. Shortly thereafter the first vehicle departed, followed by the second vehicle containing the victim.

BOURNE advised that both vehicles went to Santa Cruz and stopped on Saddle Road. Immediately after stopping soldier#3, who drove the first vehicle, left to get PIERRE. Soon thereafter a third vehicle drove up with soldier#3 as the driver and PIERRE as the front passenger. BOURNE's only memory of the third vehicle is that it had four doors. PIERRE got out of the third vehicle, removed the victim from the second vehicle and placed the victim in the back seat of the third vehicle. PIERRE also sat next to the victim in the back seat of the third vehicle. As PIERRE removed the victim from the second vehicle BOURNE and "Shaka" also exited the second vehicle and "Saucy" immediately drove-off as the sole occupant of the second vehicle. After securing the victim in the back seat of the third vehicle, soldier#3 drove-off to an unknown location. BOURNE and "Shaka" took a taxi home.

On the same date of the abduction, but later that night, soldier#3 visited BOURNE and asked for the gun. Because BOURNE had given the gun to an acquaintance known as "Ted" for safekeeping, BOURNE sent soldier#3 to "Ted." After receiving the gun from "Ted", soldier#3 left. BOURNE is of the opinion that soldier#3 tried to "set him up" because when "Ted" removed the magazine from the pistol, they realized that the magazine was empty.

About two weeks later BOURNE saw PIERRE who told him that the victim died. PIERRE told BOURNE and everything is safe because he (PIERRE) "chopped-up" the victim's body and buried it in an area where no one will find the burial site. BOURNE advised that on this visit PIERRE was alone.