# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**

**ANDERSON STRAKER,**
**CHRISTOPHER SEALEY**

**Defendants.**

**Criminal Action No.  06-102 (JDB)**

## MEMORANDUM OPINION

This case arises from the abduction and death of a U.S. citizen, Balram Maharaj, in the Republic of Trinidad and Tobago ("Trinidad") in April 2005.  Twelve defendants have been extradited over the course of two years, to face charges of conspiracy to commit hostage taking resulting in death in violation of 18 U.S.C. § 1203, and aiding and abetting.[1]  The trial of eight defendants is scheduled to commence in May 2009.  The suppression motions filed by two defendants extradited relatively early in the case have proceeded through an evidentiary hearing, and are ready for decision, along with a related motion for return to Trinidad.  Anderson Straker moves to suppress a statement he made to the Federal Bureau of Investigation ("FBI") during his extradition, and Christopher Sealey moves to suppress his statement to police authorities in Trinidad as well as a separate statement to the FBI.  Both defendants move for their return to

---

[1]  Twelve defendants have now been indicted in this case.  In addition to the eight facing trial in May 2009, three have pled guilty and one was acquitted at a trial held in June 2007 (prior to the extradition of the eight defendants presently facing trial).  For a description of how the hostage taking and death of Maharaj allegedly unfolded, see United States v. Suchit, 480 F. Supp. 2d 39, 41-49 (D.D.C. 2007).

Trinidad.  An evidentiary hearing was held on December 2 and 3, 2008.[2]  For the reasons that follow, the Court will deny defendants' motions.

**DISCUSSION**

The resolution of the pending motions requires the Court to make factual findings concerning the background and circumstances in which the statements of Straker and Sealey were taken, in order to determine whether they were provided with notice of any Miranda warnings under the Fifth Amendment or (where applicable) the right to counsel under the Sixth Amendment, how they responded to the notices, and whether their statements were voluntarily given.  To make these findings, the Court heard testimony from FBI Special Agent William T. Clauss, the lead FBI investigator who interviewed Straker on two occasions and acted as the FBI's primary liaison with the Trinidad police.  The Court also heard testimony from two other FBI agents involved in the interviews, Edgar Cruz and Marvin Freeman (at the time, the FBI assistant legal attache at the U.S. Embassy in Trinidad).  Three officers from the Trinidad police force presented testimony as well -- Wendell Lucas, Jermaline Mitchell Gosyne, and Marvin Pinder.  The testimony of the FBI and Trinidad officers went largely unrebutted, and the Court found them to be credible and forthright witnesses, albeit with some uncertainty as to the specifics of a few events due to the passage of time.[3]

---

[2]  Citations to the hearing transcript ("Tr.") refer to the volume for the December 2 and 3, 2008 proceedings unless otherwise noted.  Due to the numerosity of the briefs filed, the Court will cite to the parties' memoranda with an abbreviated description of the filing and the ECF document number.  Exhibits will also be referred to with an abbreviated description and exhibit number.

[3]  Straker raised an issue as to Clauss's credibility based on a personal relationship Clauss had with the victim's niece that began and ended in May 2005, near the beginning of the investigation.  Straker Ex. 13 (United States v. David Suchit, Tr. of Proceedings of June 11,

(continued...)

Straker presented testimony from his investigator, Dale Vaughn, and Dr. Jonathan Arden, an expert in the field of forensic pathology. Vaughn and Arden were credible and forthright witnesses but the probative value of their testimony was limited, as they acknowledged, by the fact that they did not personally observe any of the incidents at issue and lacked information bearing on the credibility of the persons they consulted for information. Straker also intended to present testimony from Theodore Guerra, his former attorney in Trinidad, on the subject of his physical condition after his arrest in Trinidad. Guerra, however, did not appear in Court, and Straker submitted Guerra's affidavit instead which the Court will weigh alongside the testimony and other exhibits received.[4] See Straker Ex. 11 (hereinafter, "Guerra Affidavit"). Straker originally planned to testify as well, then exercised his right not to do so, and then made a brief testimonial statement to the Court at the end of the motions hearing, which the Court will also consider.

Sealey did not present any witnesses, instead relying on the testimony of the FBI agents

---

[3](...continued)
2007, at 79-84). Clauss detailed the circumstances of that relationship in an earlier phase of this case, and testified that the relationship did not affect his testimony. Id. Based on that testimony and the brief and relatively superficial nature of the relationship, the Court concludes that Clauss's testimony was and remains unaffected by that relationship.

[4] It is well-settled that hearsay evidence may be considered in resolving a motion to suppress evidence. United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though the evidence would not be admissible at trial.") (citing United States v. Matlock, 415 U.S. 164, 172-74 (1974), and Fed. R. Evid. 104(a)); United States v. Foster, 986 F.2d 541, 543 (D.C. Cir. 1993) (recognizing that "hearsay is generally admissible" at suppression hearings). Hearsay statements, like any other evidence, should be considered in light of their trustworthiness and reliability (see Matlock, 415 U.S. at 174-75), and the Court has considered those factors here in relying upon the hearsay statements proffered in this matter. The Court notes that the government objects to consideration of the Guerra affidavit because it is unsworn. However, considering Guerra's unexpected absence from the hearing, and the substantial interest in ensuring a complete evidentiary record, the Court will consider the affidavit in resolving the motions.

and Trinidad police officers to support his suppression motion. With this preface, the Court turns to the task of making the factual determinations necessary to resolve the motions.

**I.     Straker's Motion to Suppress**

Straker was questioned by the FBI on two occasions -- first, on January 9, 2006, shortly after his arrest in Trinidad, and then on July 29, 2007, when he was extradited to the United States. The government has represented that it will seek to admit only the statement from July 29, 2007. Straker contends that suppression of that statement is required under the Fifth and Sixth Amendments based on events that occurred during the first session. Hence, the Court's factual findings cover both interviews.

**A.     Factual Findings**

Straker was arrested by Trinidad police on January 6, 2006, in connection with the April 2005 kidnapping of Balram Maharaj, and taken to the La Horquetta Police Station. See Tr. at 9; Gov't Ex. 5 (station diary extract, entry no. 16).[5] The Trinidad police informed him that he was a suspect in their investigation and advised him of his rights under Trinidad law, which include, among other things, the right to remain silent, the right to communicate with a legal representative, relative, or friend, and a caution that the statement may be used against the accused. Tr. at 9-13; see also Gov't Ex. 1 (Trinidad & Tobago Police Service, "Reminder to Law Enforcement Officers Re: Cautions"); Gov't Ex. 2 (Judges' Rules and Administrative Directions

---

[5] A "station diary extract" refers to reproductions of the station diary kept at each police station in Trinidad. The station diary is a continuous record of what happens at a police station, in chronological order, recorded by hand in a book that is about three feet wide and two feet long. Tr. at 258-59. When a station diary is needed for court in Trinidad, it is either reproduced by photocopy (with irrelevant entries redacted) or by a handwritten transcription that quotes the entries relevant to the case. Id. at 14-15, 258-59. The original station diary typically is not taken out of the police station, and hence the photocopy or handwritten "extracts" from the relevant police stations were presented in evidence, instead of the originals. Id.

to Police, Home Office Circular No. 89/1978) (hereinafter, "Judges' Rules").  Straker was interviewed by Constable Abraham on January 6 and then by Sergeant Lucas on January 7, each time denying knowledge of the kidnapping or killing.  Gov't Ex. 3 (interview notes dated Jan. 6, 2006), Gov't Ex. 4 (interview notes dated Jan. 7, 2006).  He was advised of his rights under Trinidad law on each occasion.  Tr. at 10-13.  Straker was asked to sign the officers' interview notes, but declined.  Id. at 55-56.  Straker met with his attorney, Theodore Guerra, the next day, January 8, at the La Horquetta station for about a half hour, and he instructed Straker not to sign any documents or speak to anyone.  Guerra Affidavit ¶ 3; Tr. at 16.

Sergeant Lucas informed Clauss on January 9 that the Trinidad police had taken custody of Straker, and Clauss then requested an opportunity to interview Straker.  Tr. at 49-50.  Lucas agreed, seeing nothing objectionable because the FBI was conducting a parallel investigation and Trinidad law allows police to question suspects without their attorneys present.  Id. at 50-55.  Additionally, the investigation had entered a high, fast-paced operational status, with Maharaj's dismembered remains having been discovered the day before.  Id. at 89.

At approximately 7:55 p.m. on January 9, the Trinidad police brought Straker up from the holding cell in La Horquetta station, where he had been held since his arrest.  Id. at 86; Gov't Ex. 5 (station diary extract, entry no. 93).  On the day of the interview, Straker was provided two meals -- a lunch of black-eyed peas pelau (stew) with salad, and a dinner of bread, peanut butter, and orange juice, both of which he accepted.  Gov't Ex. 5 (station diary extract, entry no. 55).  He was taken to a room on the second floor by Lucas and seated on one side of a rectangular table measuring about five feet long and three feet wide, with Lucas and three FBI officers -- Clauss, Cruz, and Freeman -- on the other side.  Tr. at 85-86.  No weapons were exposed -- in fact,

Clauss and Cruz lacked the authority to carry weapons in Trinidad and, hence were unarmed.[6]  Id. at 56, 128.  The testimony was conflicting on whether Straker was handcuffed during the interview, but weighing both Clauss's and Lucas's testimony -- Lucas recalling that Straker was cuffed, Clauss certain that he was not[7] -- it is likely that Straker was in handcuffs when Lucas brought him up from the holding cell, but was then uncuffed at some point during the interview.  See id. at 56, 129, 201-02.

The interview lasted about three and a half hours.  Id. at 56; Gov't Ex. 5 (station diary extract, entry no. 98, indicating that interview ended at 11:30 p.m.).  Clauss began the interview by identifying himself, Cruz, and Freeman as members of the FBI investigating the case.  Tr. at 86.  Clauss read the international advice of rights notice to Straker.  Id. at 87, 105-06.  That notice informs a suspect of his Miranda rights -- most notably, the right to remain silent and the right to have counsel present during the interrogation -- but states that appointment of counsel cannot be effectuated by the United States in a foreign country for a person not in U.S. custody.  See Gov't Ex. 20.[8]  Straker asked to have the form so that he could read it himself.  Tr. at 87,

---

[6]  Lucas presumed that Clauss and Cruz were armed, but later clarified that he did not see them carrying any weapons.  Tr. at 75-76.  The record suggests that Lucas was armed, but he did not have his weapon exposed.  Id. at 56, 75-76.  Freeman is authorized to carry a weapon in Trinidad, but the record is unclear as to whether he had one that evening.  Id. at 128.

[7]  Considering that Lucas assisted in transferring Straker from the holding cell to the interview room, it is quite plausible that Straker would have been handcuffed.  Tr. at 56, 86; Gov't Ex. 5 (station diary extract, entry no. 93).  But Clauss was certain that Straker was not cuffed during his questioning, and it is likely he would have noticed the presence of handcuffs, having handed Straker an advice of rights form to review and sign, and observing Straker review the document "line by line."  Id. at 76, 87, 129.  Freeman recalled that Straker was not handcuffed, but indicated some uncertainty about it.  Id. at 202.

[8]  Government Exhibit 20 is the standard international advice of rights form.  It reflects the form provided to Straker, though this particular exhibit bears the signature of a co-defendant because a blank unsigned copy was not readily available at the motions hearing.

105-06.  He then closely reviewed it and asked questions about certain parts, which resulted in a

conversation "back and forth" about the form for about a half hour.  Id.  During this time, the FBI

team felt that Straker was trying to "feel [them] out" for what the FBI knew about the case and

trying to ascertain what the FBI knew about his role in particular.  Id. at 89-90. About halfway

through the interview, Straker told the agents that he had an attorney.  Id.  Although Straker's

exact words are unknown, the record indicates that he said that "he didn't want to sign anything

and that he didn't want to talk details about the case until he had a chance to speak to his lawyer."

Id. at 89, 106 (quoting Clauss's testimony); see id. at 144 (Cruz's testimony that [Straker] "just

said that . . . he wanted -- or he would prefer to talk to his attorney before any questions"); id. at

190 (Freeman's testimony that Straker indicated he might want to speak with the FBI at some

point).

　　　The session continued for another hour or so, with intermittent questions from the FBI

about Straker's biographical and family information (which he readily provided) and responses

from Straker that the FBI construed as an attempt by him to keep the conversation going in order

to obtain information about what the FBI knew about the case.   Tr. at 107-08; Gov't Ex. 15 (FBI

summary of interview) (describing the biographical information obtained).  Indeed, Lucas also

noted that Straker was "leading most of the conversation."  Tr. at 60.  Straker expressed concern

for his family -- in particular, his children -- noting that "big people" were involved in the case

and threats had been made against his family members, but declining to elaborate on the contents

of the threats.  Id. at 90; Gov't Ex. 15 (FBI summary of interview).  At one point, Straker said

that Clauss reminded him of his biological father in the United States, and joked that since

Clauss was with the FBI, he could locate him for Straker.  Tr. at 18 (Lucas), 86, 107 (Clauss),

144 (Cruz), 189-90 (Freeman).[9]  Straker expressed some degree of interest in generally what the

FBI could do for him, leading Lucas and Freeman to conclude that he might be interested in

making a deal or otherwise cooperating.  Id. at 60, 190.  At some point near the end of the

session, Straker indicated that "after having access to his attorney, he would be willing to speak

to the agents."  Gov't Ex. 15, at 2 (FBI summary of interview); Tr. at 144, 156-57.

In response, Clauss stated that, after Straker had talked to his attorney, he could contact

them and they would be willing to follow up at that point.  Tr. at 90-91.  Freeman was the

preferred point of contact because he was based at the U.S. Embassy in Trinidad, in contrast to

Clauss and Cruz who were based in Miami.  Id. at 90-91, 145, 190.  He thus gave Straker his

business card, which provided his contact information at the Embassy.  Id.  The agents then

terminated the interview, realizing that no statement from Straker would be forthcoming that

evening.  Id. at 91.  At the conclusion of the interview, Clauss took a photograph of Straker -- a

headshot -- in the interview room.  Id. at 20, 92, 145; Gov't Ex. 6 (Straker photograph of Jan. 9,

2006).  Straker was then returned to his holding cell.  Tr. at 92.

The overall atmosphere of the three-hour interview was calm, with no indications of

agitation or raised voices; the agents and Lucas remaining seated throughout.  Tr. at 86, 143, 165-

66.  Lucas, Clauss, Cruz, and Freeman each testified that no one threatened Straker or physically

---

[9]  In his oral statement to the Court, Straker submitted that the Court should not credit the
testimony of the FBI agents or Lucas because Straker has never known his birth father and does
not know what he looks like, making their testimony implausible.  Tr. at 306.  Four witnesses
credibly testified that the incident occurred, and their accounts of Straker's statement on January
9, 2006 about Clauss's resemblance to his birth father are remarkably consistent.  Id. at 18, 86,
107, 144, 189-90.  Moreover, it is quite plausible that Straker made the referenced comment,
without knowing what his birth father looked like, in an attempt to establish some rapport with
the FBI and thereby elicit some amount of information that might help him determine his status
in the investigation.

assaulted him.  Id. at 19, 91, 142-43, 165-66.[10]  There were no breaks to go to the restroom or eat, but there was no indication that such a break was needed or requested.  Id. at 61.

Straker was taken to the Arouca station the next day, January 10, 2006, where he was formally charged.  See Gov't Ex. 6-A (notice to prisoner, dated Jan. 10, 2006); Gov't Ex. 5 (station diary extract, entry no. 63).  His first appearance in Trinidad court was set for the following day, January 11.  Tr. at 22.[11]  Upon his transfer from the police station to the court, Straker was taken to the court reception officer, Corporal Simmons, for routine processing, which included questions pertaining to his health and fitness to appear before the court.  Id. at 26-27.  Straker informed Simmons that he had a bump on his head; upon hearing of this, Lucas instructed another officer to take Straker to the St. George Street, Port of Spain Health Center.

_____

[10]  Straker presented testimony from his investigator, Dale Vaughan, on the subject of whether Clauss made threatening comments soon thereafter to an unindicted co-conspirator, Doreen Alexander, while Straker sat in an adjacent cell.  See Tr. at 63, 282-84.  The alleged incident, which falls far afield of Straker's primary claims in support of his suppression motion, is not properly before the Court because Straker failed to give the government notice that he would put Alexander in issue at the evidentiary hearing, depriving the government of a full opportunity to put on rebuttal evidence.  Tr. at 280-81.  His limited testimony on the subject, in any event, lacks probative value.  The Court has no statement from Ms. Alexander -- not even an unsworn affidavit -- despite an invitation to counsel to submit one several months ago.  See United States v. Straker, 567 F. Supp. 2d 174, 181 n.7 (D.D.C. 2008).  Clauss has testified that the incident did not occur, and his testimony is corroborated by the testimony of Cruz who was present when Clauss spoke to Ms. Alexander.  Tr. at 129-31, 157-58.  The government also has raised serious questions about Alexander's credibility, which highlights the prejudice caused by Straker's failure to provide notice of this argument.  See id.. at 284-86 (noting that Alexander is facing the death penalty in Trinidad for the same offense and lived with Straker); see also Gov't Ex. 4 (interview notes dated Jan. 7, 2006) (indicating Straker lived with Alexander for two years).

[11]  Guerra reports the court hearing date as January 9, 2006.  However, Lucas testified that the court date was January 11, 2006, and a local newspaper also reported the court date as January 11.  See Tr. at 22, 43-44; Straker Ex. 8 (The Guardian article, dated Jan. 12, 2006).  The January 9 date is not plausible because it is undisputed that the date of the FBI interview at the LaHorquetta station was the evening of January 9, and occurred before Straker's court appearance.

9

Id.; Gov't Ex. 7 (Simmons' mem. dated Jan. 13, 2006).

Straker was taken to the St. George Street Center, whose contemporaneous records of the visit describe his injury as "small lump on crown of head consistent with [illegible] of hitting head on louvre," and note the probable degree of force as "small impact blunt trauma." Gov't Ex. 8 (medical report dated Jan. 11, 2006); Tr. at 29, 82. During the course of the examination, the Center noted that Straker had tested positive for Hepatitis B five years previously, provided medicine for a cough, and then declared him fit to attend court. Gov't Ex. 9 (St. George Street Center mem. dated Nov. 20, 2008). By the time Straker was returned to court, he was wearing a dust mask, apparently because an official -- either at the Center or at the court -- was concerned that Straker might have tuberculosis. Tr. at 64-65; Straker Ex. 7 (The Express article dated Jan. 12, 2006).

When Straker's case was finally called in court later that day, his attorney, Theodore Guerra, informed the court that Straker had a substantial lump on his head and, further, that Straker had represented to him that his injury was caused by an American police officer -- referring to Clauss -- who had assaulted him in the presence of local police. Guerra Affidavit ¶ 5; Tr. at 144; Straker Ex. 8 (The Guardian article dated Jan. 12, 2006). Straker's allegations against the FBI were reported in the local newspapers, along with speculation about his overall health condition. Straker Ex. 7, 8 (newspaper articles). Lucas did not make further inquiries into the St. George Street Center medical report, notwithstanding Straker's allegations of police abuse, because he considered the medical report prima facie valid. Tr. at 46. It also appears that he found no need to investigate the allegations because, as a witness present during Straker's interview with the FBI, he simply did not believe the allegations. Id. at 19.

The visit to the St. George Street Center had unintended consequences for Straker. He

10

was subjected to additional medical tests to determine whether he had tuberculosis, and a positive test was returned on January 30, 2006. Tr. at 36; Gov't Ex. 11 (Port of Spain magistrate court letter dated Jan. 27, 2006); Gov't Ex.12 (medical record dated Jan. 30, 2006). Rumors circulated about whether he had tuberculosis or hepatitis, and he was not allowed to appear in court again until his tuberculosis condition was resolved. Tr. at 33-37; Gov't Ex. 13, at 27-28 (Port of Spain magistrate court minutes of Feb. 3, 2006 and Feb. 13, 2006). Straker was also held separately from the general population in the Royal Jail for an undetermined time, roughly through March 2006, due to his medical condition. Gov't Ex. 13, at 29 (Port of Spain magistrate court minutes). By March 7, 2006, he was apparently medically cleared for attending court proceedings, and returned to the general prison population. See Gov't Ex. 10, at 4 (extract of magistrate case book); Tr. at 32-34; see also Straker's Mem. at 7 (ECF #188).

The FBI did not attempt to contact Straker again during his 18 months in custody in Trinidad until the date of his extradition to the United States. Straker, however, attempted to contact Freeman by telephone about two to three weeks after the January 9, 2006 interview. Tr. at 109, 190, 205, 223. The exact contents of the message is unavailable, but Freeman recalls that it was to the effect of "this is Anderson Straker; can you contact me?" Id. at 206. Freeman advised the U.S. prosecutor of the call. Id. at 206. Freeman also spoke to Clauss in late January 2006, at which time Freeman discussed the call with him. Id. Clauss testified that Freeman then described the message as "Straker had reached out to him and said he did want to talk with him," but that Freeman did not attempt to return Straker's call because the director of public prosecutions in Trinidad advised him not to do so in light of Straker legal representation in the local courts. Id. at 109.

On July 27, 2007, the Trinidad government issued a warrant surrendering Straker for

extradition to the United States to face the hostage taking charges in this case.  <u>See</u> Gov't Ex. 22.

Straker had, by that time, been formally indicted in a superseding indictment filed on September

20, 2006, in this Court.  Straker signed a document waiving his challenge to the extradition.

Straker Mem. at 2 (ECF #210).[12]  He was transferred to the custody of the FBI on July 29, 2007,

with Clauss and Cruz handling Straker's transfer to the United States.  Tr. at 94-99, 147-51; Gov't

Ex. 17 (FBI summary of interview of July 29, 2007).

Clauss formally arrested Straker at the Piarco International Airport in Port of Spain,

Trinidad the morning of July 29.  Gov't Ex. 17 (FBI summary of interview of July 29, 2007).  He

orally advised Straker of his <u>Miranda</u> rights and presented Straker with the FBI advice of rights

form (Form FD-395) setting forth those rights.  Tr. at 95, 147; Gov't Ex. 16.[13]  The form ends

with the following statement for the suspect to sign: "I have read this statement of my rights and I

understand what my rights are.  At this time, I am willing to answer questions without a lawyer

present." Gov't Ex. 16.  Straker signed the document, and Clauss and Cruz then signed as

witnesses.  <u>Id.</u>; Tr. at 95, 147. Both Clauss and Cruz testified that Straker appeared willing to

sign and that, in contrast to their last meeting, Straker did not raise any questions about his rights.

<u>Id.</u> at 95, 147.  However, when the FBI sought to photograph Straker at the Port of Spain airport

---

[12]  The document waiving Straker's challenge to extradition was not submitted into evidence, but as noted above, Straker conceded this fact in the briefing.  Straker Mem. at 2 (ECF #210) ("Defendant acknowledges signing a document that purports to be a waiver of a challenge to extradition.").

[13]  This form states: "Before we ask you any questions, you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time."  Gov't Ex. 16.

and other times along the trip -- a routine part of every extradition, according to Clauss -- Straker refused to have his photograph taken. Id. at 117-18. He crouched down and covered his face; Clauss recalled that Straker said "he did not want his kids him like that." Id. at 117. Presumably, he was in handcuffs and/or leg irons, like the other co-defendants who were extradited on that date. See Straker Ex. 2, 3, 5 (photographs of defendants Pierre, Nixon, and Sealey).

There was then some delay in commencing the interview, apparently because of the logistics of getting through the first leg of the flight from Trinidad to San Juan, Puerto Rico. Tr. at 96 (noting that three other defendants were being transported to the United States at the same time). The interview commenced once they arrived in San Juan, where most of the interview took place. Id. at 96 (Clauss's testimony indicating that the agents "conclud[ed] the interview with Mr. Straker in the Customs office in San Juan"); id. at 148, 150 (Cruz's testimony noting that "the main interview" took place in San Juan); see also Gov't Ex. 17 (FBI summary of interview identifying the location of the interview as "San Juan, Puerto Rico/Washington, D.C."). Clauss led the questioning; Cruz was present and took notes, and one other FBI officer (Michael LaPlante) was present during part of the interview. Tr. at 96, 148. Straker did not ask to stop the interview and overall seemed "cooperative." Id. at 96-97. According to the FBI summary of the interview, prepared by Cruz, Straker acknowledged having a role in planning the kidnapping of Balram Maharaj and described the roles of several co-defendants. Gov't Ex. 17. This is the document that Straker has moved to suppress.

At the end of the interview, the FBI prepared Straker, along with three co-defendants, for movement back to the aircraft. Tr. at 96, 148. As Clauss, Cruz, and Straker were leaving the Customs Office, Clauss mentioned to Straker that he had read in the newspapers that Straker had claimed he was assaulted by U.S. officials during their earlier interview and asked him something

to the effect of "what was up with that?" or "what was the deal?"  Id. at 96-97, 148.  Clauss and

Cruz each recalled that Straker seemed amused -- as Clauss recalls its, Straker chuckled, and as

Cruz recalls it, he smiled -- and then attributed the claim to his Trinidad attorney, Guerra.  Id.

When Straker landed in Washington, he went through routine booking and was held at D.C. Jail

where he remains in custody pending trial.  Id. at 118.

### B.    Legal Analysis -- Fifth Amendment

#### 1.    The Edwards v. Arizona Rule

It is by now well-established that the Fifth Amendment privilege against self-

incrimination protects nonresident aliens facing a criminal trial in the United States even where

the questioning by United States authorities takes place abroad.  See In re Terrorist Bombings of

U.S. Embassies in East Africa, 552 F.3d 177, 198-201 (2d Cir. 2008); United States v. Yousef,

327 F.3d 56, 145-46 (2d Cir. 2003) (noting that where United States law enforcement agents

participate in questioning abroad, Miranda warnings may be required); Suchit, 480 F. Supp. 2d at

52 n.21.  This proposition is based on the status of the privilege against self-incrimination as a

"fundamental trial right," as to which a violation occurs not at the moment of custodial

interrogation, but at the time a defendant's statement is used against him at an American criminal

proceeding.  See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 200

(quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990)).  The government thus

concedes the applicability of the Fifth Amendment to the FBI actions at issue. Gov't Mem. at 10

(ECF #258) ("This 'trial right' distinction . . . mandates that the protections of the Fifth

Amendment . . . be extended to nonresident aliens tried in the United States.").

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that the Fifth

Amendment prohibition against compelled self-incrimination requires that custodial interrogation

be preceded by advice to the defendant that he has the right to remain silent and the right to the presence of an attorney, and that if the defendant invokes those rights, the interrogation must cease. Id. at 479. Subsequently, the Supreme Court in Edwards v. Arizona, 451 U.S. 477 (1981), further delineated the limitations on police conduct when the Fifth Amendment right to counsel is invoked. When "an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484. Second, an accused who invokes his right to counsel, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85.

Since then, the Supreme Court has repeatedly emphasized that Edwards creates a "prophylactic" and "bright-line" rule barring police interrogation of a subject who has invoked his right to counsel unless the subject initiates further communications with the police. Arizona v. Roberson, 486 U.S. 675, 681-82 (1988); Minnick v. Mississippi, 498 U.S. 146, 151-52 (1990). The rationale behind the Edwards rule is that "if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect." Roberson, 486 U.S. at 681. Put another way, the Edwards rule serves "'to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.'" Minnick, 498 U.S. at 150 (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)).

Subsequent decisions of the Supreme Court, however, also made clear that the Edwards rule has boundaries consistent with its rationale. First, the police are required to cease interrogation under the Edwards rule only where the subject has "unambiguously" invoked his right to counsel. Davis v. United States, 512 U.S. 452, 459 (1994). Under this standard, the subject "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. at 459-62 (holding that "[m]aybe I should talk to a lawyer" was not an unambiguous invocation of the right to counsel). Second, if the right to counsel is invoked for only a discrete, limited purpose, the Edwards prohibition does not apply to police questioning for other purposes, thus ensuring "the individual's right to choose between speech and silence remains unfettered throughout the interrogation process." Connecticut v. Barrett, 479 U.S. 523, 528-29 (1987). Third, even after a defendant invokes the right to counsel, the police may resume interrogation where "the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. An "initiation" sufficient to authorize renewed police questioning occurs when the defendant "evince[s] a willingness and a desire for a generalized discussion about the investigation," and also knowingly and intelligently waives his right to counsel based on a consideration of the totality of the circumstances. Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality); United States v. Ware, 338 F.3d 476, 481 (6th Cir. 2003). In this case, the Court must consider whether any of these three limitations on the Edwards rule applies -- did Straker invoke his Fifth Amendment right to counsel at the January 2006 interrogation, did he place any limitations on that invocation, and did he later initiate a further communication with the FBI about the investigation under circumstances that would allow the FBI to resume interrogation.

16

## 2.    Invocation of the Right to Counsel

The first two questions ask whether Straker invoked his right to counsel and, if so, whether he placed any limitations on that invocation.  The government contends that it is "questionable" whether Straker unambiguously invoked his right to counsel, noting that many of Straker's statements amounted only to a statement that he had talked to an attorney and that Straker was interested in keeping the conversation alive.  See  Gov't Mem. at 2-6, 10 (ECF #329).  Ultimately, however, the government acknowledges that the better view is that Straker invoked his right to counsel, with the inquiry then focusing on whether he placed any limitations on that invocation.  The Court agrees.  It is true that the mere mention of an attorney and reference to advice from an attorney is not an unambiguous invocation of the right to counsel. See Sechrest v. Ignacio, 549 F. 3d 789, 807 (9th Cir. 2008) (holding that defendant's reference to attorney advice "to keep his mouth shut" was not an invocation of right to counsel, nor were comments such as "maybe [I] ought to see an attorney" or "I think I would like to talk to a lawyer"); United States v. Peters, 435 F.3d 746, 751-52 (7th Cir. 2006) (observing that circuits have held that a statement such as "I might want to talk to an attorney" or "[d]o you think I need a lawyer?" or a request to call someone about possible representation is too ambiguous to constitute invocation of right to counsel).

The quantum of evidence in this case, however, shows that there is more than a mere reference to an attorney or attorney advice.  Rather, Clauss testified that the FBI terminated the interview "because it got to the point where it was clear that he was not in a position at that time to answer any questions regarding the case," noting that Straker said "that he didn't want to sign anything and that he didn't want to talk details about the case until he had a chance to speak to his lawyer."  Tr. at 89.  This is consistent with Cruz's testimony that "[n]ear the end he [Straker] just

said that . . . he wanted -- or he would prefer to talk to his attorney before any questions." Id. at

144.  Under the Davis standard, a suspect "need not speak with the discrimination of an Oxford

don," but rather need only "articulate his desire to have counsel present sufficiently clearly that a

reasonable police officer in the circumstances would understand the statement to be a request for

an attorney." Davis, 512 U.S. at 459.  A reasonable police officer would have understood

Straker's words to be a request for an attorney, and, indeed, the FBI interpreted his request as

such.

　　　　The inquiry then focuses on whether Straker placed any limitations on the invocation of

his right to counsel that would authorize the FBI to question him directly under other

circumstances.  See Barrett, 479 U.S. at 529.  The government contends that Straker expressed a

desire to leave open the opportunity to speak with the FBI after he had communicated with his

Trinidad counsel.  Straker contends that he made it clear he did not wish to speak to the FBI

without counsel present.  See Straker Mem. at 7 (ECF #306); Straker Mem. at 4 (ECF #330).

The record is compelling that Straker made his request for counsel subject to an understanding

that he would have an opportunity to contact the FBI later if he so wished.  First, the testimony of

Clauss, Cruz, and Freeman is consistent on this point.  Each testified that Straker made a

statement indicating that, after he had spoken to his attorney, he might be interested in talking to

the FBI again.  Tr. at 89-91, 144, 156-57, 190.  This is corroborated by the contemporaneous

summary of the interview prepared by Clauss six days after the interview, which acknowledges

Straker's refusal to speak with the FBI "at this time," but further notes that "[h]e stated . . . that

after having access to his attorney, he would be willing to speak to the agents," and hence, he was

"provided with contact numbers for ALAT Freeman at the U.S. Embassy in Trinidad."  Gov't Ex.

15, at 2.  Straker's desire to leave open a window for further communications is consistent with

the testimony of the officers present on January 9 that Straker was keeping the conversation going in order to "ascertain what exactly [the FBI] knew about his role." Tr. at 90 (quoting Clauss's testimony); id. at 203 (Freeman testimony that "he was trying to determine exactly what we knew about his activities without him having to sign -- waive his rights").

Therefore, Straker's invocation of the right to counsel is properly construed as a request to deal with the FBI only through counsel until Straker decided otherwise. This "limitation," however, overlaps substantially with the exception to the Edwards rule allowing for interrogation where the defendant "initiates" communications with the police. The Court therefore now turns to an analysis of whether Straker later indicated a desire to pursue that opportunity for further communication.

### 3. Exception Where Defendant Initiates Further Communications

#### a. Initiation

Edwards holds that police may resume interrogation where, after invocation of the right to counsel, the defendant himself "initiate[s] further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. The government contends that Straker "initiated" such a communication when he left a telephone message for Freeman asking him to call him back. See Gov't Mem. at 12-13 (ECF #329). Straker's counsel questions the premise that Straker left such a message, and denies that interrogation could be resumed on that basis. See Straker Mem. at 2 (ECF #306).

To determine whether Straker "initiated" communications with the FBI, the Court must evaluate whether he "evinced a willingness and a desire for a generalized discussion about the investigation," keeping in mind that not every statement by an accused will "initiate" a conversation with police as contemplated by Edwards. See Bradshaw, 462 U.S. at 1045-46

(observing, for example, that inquiries or statements that are "routine incidents of the custodial relationship" -- such as a request for water or use of a telephone -- do not "initiate" a conversation about the investigation).  The Supreme Court clarified in <u>Bradshaw</u> that a second inquiry is also required before reinterrogation after "initiation" will be condoned -- whether the suspect made a "knowing and intelligent" waiver of his right to counsel under the totality of the circumstances. <u>Id.</u> at 1046.  Even if the suspect reinitiates conversation, the burden remains upon the prosecution to show by a preponderance of the evidence that the subsequent events indicate a valid waiver of the Fifth Amendment right to have counsel present.  <u>Id.</u> at 1044; <u>United States v. Huerta</u>, 239 F.3d 865, 873 (7th Cir. 2001).  Although this issue presents a close call, the Court concludes that the government has met its burden here.

The Court credits the testimony of Marvin Freeman that Straker left him at least one voice mail message about two weeks after the January 9 interview, asking Freeman to call him. Tr. at 190, 205-07.  The Court further considers the context in which the message was left -- Straker stated just weeks earlier that he might wish to talk to the FBI about the investigation after he had consulted with his counsel, and indeed, Freeman had provided his business card to Straker for that very purpose.  <u>Id.</u> at 90-91, 144-45, 158-59, 190; Gov't Ex. 15 at 2 (FBI summary of interview).  This context is important, for where a defendant specifically requests to speak to a federal investigator, in contrast to local police or court officials, the context may reasonably be construed to indicate that the initiation of communication is directed toward the investigation.[14]

---

[14] Indeed, Straker's intense desire to be heard was evident at the motions hearing, when after being cautioned by the Court about the risks of making a statement, Straker availed himself of his right to address the Court directly to get his version of the events into the record.  Tr. at 303-06.  The Court finds it quite plausible that, despite any cautions by Guerra that there are risks to speaking to the FBI without counsel present, Straker would choose to do so.

See United States v. Velasquez, 885 F.2d 1076, 1085 (3d Cir. 1989) (holding that defendant's comment "What is going to happen?" reflected his willingness to engage in a generalized discussion about the investigation "because [he] specifically requested to speak with the federal investigator").  That is particularly so here, considering that Straker communicated to Freeman that he would like to talk shortly after he indicated to the FBI that he wanted to leave the door open for further discussions.  For these reasons, the Court finds that Straker's message to Freeman evinced his willingness and desire to discuss the investigation, and thus constituted an "initiation" of communication with police as contemplated by Edwards and Bradshaw.

It makes no difference that the "initiation" of communications was directed at Freeman, rather than Clauss, the agent who ultimately conducted the second interrogation that produced the statement at issue.  The record establishes that Clauss was aware that Straker had reached out to Freeman, shortly after Freeman received the telephone message.  Tr. at 109.  The record also indicates that both Freeman and Clauss even then regarded that initiation of communications as opening the door to further discussions about the investigation, but only refrained from doing so at the request of the Trinidad director of public prosecutions who felt that it would be inappropriate while Straker was represented by Guerra.  Id.  Under these circumstances, Straker's transfer to the United States provided a logical and permissible point at which Clauss could later pursue a further discussion about the investigation with Straker.

####    b.       Voluntary, Knowing, and Intelligent Waiver

The bare fact of an initiation of communication by the accused does not, by itself, make the statement obtained from the second interview admissible.  As the Supreme Court emphasized in Oregon v. Bradshaw, the Court must then proceed to consider whether the defendant knowingly and intelligently waived his Fifth Amendment right to counsel before providing the

statement. 462 U.S. at 1046. This inquiry, of course, also includes an examination of the voluntariness of the waiver. See Velazquez, 885 F.2d at 1086 (citing Miranda, 384 U.S. at 444). The inquiry requires an assessment of the totality of the circumstances, and "depends upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." Bradshaw, 462 U.S. at 1046. The totality of the circumstances here -- both the events on July 29, 2007, and the events dating back to January 2006 -- readily indicate that Straker made a valid waiver.

### i. Circumstances of Waiver on July 29, 2007

On July 29, 2007, the day Straker was extradited, Clauss advised Straker of his Miranda rights, using the standard FBI advice of rights form. See Gov't Ex. 16. Straker agreed to waive his rights and signed the waiver document, with both Clauss and Cruz bearing witness to his signature. Tr. at 95; Gov't Ex. 16; see also Tr. at 147 (Cruz's testimony noting that Straker did not have questions about his rights before he signed the waiver and appeared willing to talk). More significantly, Straker already had familiarity generally with the Miranda warnings from his January 2006 interview with the FBI, at which time he asked several questions over the course of three hours, and demonstrated that he understood his rights well enough to make an initial decision declining to speak about the investigation until he had consulted with his Trinidad attorney. Tr. at 87-89, 105-06, 144. He also had been represented by Guerra during his 18-month period of incarceration in Trinidad, who had been advising Straker generally not to speak to police or sign documents. See Guerra Affidavit ¶ 3. Thus, the waiver was knowing and intelligent. The only question that has genuinely been placed in dispute by Straker is the voluntariness of the waiver. See Straker Mem. at 11-17 (ECF #188).

The Court begins with the circumstances surrounding the waiver on July 29, 2007. The

only coercive circumstance surrounding his signing of the waiver is his placement in handcuffs and/or leg irons.  But this is a routine incident of police custody -- one that a defendant would reasonably regard as such -- and thus is not viewed as coercive.  See United States v. Doe, 149 F.3d 634, 639 (7th Cir. 1998) (holding that Miranda waiver obtained while defendant was handcuffed in a squad car did not render the waiver involuntary).  Moreover, Straker has pointed to no other circumstances that day indicating a coercive atmosphere.  Indeed, the only FBI actions that appeared to cause Straker distress were the attempts to photograph him during the extradition in accordance with FBI extradition procedures.  Tr. at 117-18.  But the record does not indicate that those photograph attempts occurred prior to Straker signing the waiver. Moreover, the Court is unaware of any case indicating that the taking of a routine custodial photograph is considered coercive -- such a contention, on its face, strikes the Court as implausible.  More significantly, the fact that Straker resisted (successfully) the FBI's attempts to photograph him, but readily acceded to signing the waiver, corroborates the finding that Straker was fully capable of refusing requests from the FBI that day, undermining any contention that he signed the waiver based on an atmosphere of coercion.

Furthermore, the Court observes that the July 29, 2007 interview took place 18 months after their first meeting, and the FBI had no further conversations with Straker up to that point. Hence, there was no occasion for the FBI to "badger" Straker into signing the waiver -- the central concern of Edwards.[15]  See Minnick, 498 U.S. at 150 (observing that the purpose of

---

[15]  Some circuits have suggested, in different formulations, that the lapse of time or a transfer from police custody back into general population erases the prophylactic protection from police interrogation required by Edwards.  See Isaacs v. Head, 300 F.3d 1232, 1265 (11th Cir. 2002) (observing that "'if a rule is devised to prevent badgering a suspect into giving up his right to counsel, and because of an immense time gap, no badgering even arguably occurred, then

(continued...)

<u>Edwards</u> is "'to prevent police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights'") (quoting <u>Michigan v. Harvey</u>, 494 U.S. 344, 350 (1990)).  Indeed, the FBI purposefully refrained from engaging in any contact with Straker at the request of the Trinidad director of public prosecutions.  Tr. at 109.

### ii.    Alleged Coercive Effects Arising from the January 2006 Interview and Incarceration in Trinidad Prisons

Perhaps recognizing that the circumstances of July 29, 2007 contain no indicia of coercion, Straker contends that his entire statement that day -- including his waiver -- was not voluntary because the circumstances of his custody in the 18-months leading up to his extradition made him fearful of the FBI and put him in a state of mind vulnerable to police questioning.  <u>See</u> Straker Mem. at 11-17 (ECF #188).  The standard for the voluntariness of a <u>Miranda</u> waiver is the same as the standard for voluntariness of a confession.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986).[16]  Hence, the Court considers Straker's argument that his <u>Miranda</u> waiver was coerced, together with his argument that the entire statement provided on that date was

---

[15](...continued)
blind obedience to the rule is not required'") (quoting with approval <u>Clark v. Maryland</u>, 781 A.2d 913, 947-48 (Md. 2001)).  The Supreme Court has granted certiorari to address this very issue.  <u>See</u> <u>Shatzer v. Maryland</u>, 954 A.2d 1118 (Md. 2008), pet. for cert. granted sub nom. <u>Maryland v. Shatzer</u>, --- S. Ct. ---, 2009 WL 160638 (U.S. Jan. 26, 2009).  The Court need not resolve the question whether the <u>Edwards</u> protection expires after a lapse of time because the holding here rests on the finding that Straker initiated communication with the FBI about the investigation and, hence, the second interview was permissible consistent with <u>Edwards</u>.  The lapse of time is notable here only in considering the totality of circumstances, under <u>Bradshaw</u>'s second inquiry, to determine whether Straker's written waiver of his <u>Miranda</u> rights after the initiation of communications was a voluntary, knowing, and intelligent waiver.

[16]  Although the voluntariness of a confession, on the one hand, and the validity of a <u>Miranda</u> waiver, on the other, are typically discrete inquiries (see <u>United States v. Bradshaw</u>, 935 F.2d 295, 299 (D.C. Cir. 1991)), the analyses collapse into a single one where, as here, a <u>Miranda</u> waiver is challenged on the basis that it is involuntary, supported by the same circumstances that allegedly demonstrate the confession itself is involuntary.

involuntary.

Under either standard, the defendant's statement -- his waiver or his confession -- must be "the product of a free and deliberate choice rather than intimidation, coercion or deception" or some other police overreaching. Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Under both circumstances, the government bears the burden of proving voluntariness by a preponderance of the evidence. Id.

The backbone of Straker's coercion argument is that Clauss punched him in their first January 2006 meeting, and that Sergeant Lucas struck him with a flashlight. See Straker Mem. at 4-5, 15 (ECF #188). The subject of whether Straker was struck by Trinidad police or the FBI was the focus of much testimony at the motions hearing. In the end, there simply is no evidence to support Straker's contention that he was struck by either officer, not even the testimony of his former attorney, Theodore Guerra, or his forensic medical expert, Dr. Arden.

Clauss and Lucas each strongly denied that either had struck Straker or otherwise subjected him to any abuse, and their testimony was corroborated by the testimony provided by Cruz and Freeman. Tr. at 19, 91, 142-43, 165-66. The testimony of all four officers was consistent -- not only in their denials of any physical assault, but also in their cohesive descriptions of the entire course of the interview, including the order in which events occurred, the atmosphere of the interview, the description of Straker's statements about his contacts with an attorney, Clauss's resemblance to his biological father, and the circumstances surrounding the termination of the interview. More significantly, a photograph of Straker was taken at the end of the January 9, 2006 interview, and there is no indication whatsoever that there is a lump on the head, a laceration on the mouth, or any other head injury, as Straker claims he incurred. See Gov't Ex. 6. The photograph provides powerful corroboration of the testimony provided by

Lucas and the FBI agents.

Straker's main piece of evidence in support of his contention that Clauss hit him is the unsworn statement of his Trinidad attorney, Theodore Guerra, stating the Straker told him he was "assaulted by an American Police Officer in the presence of local police," which resulted in a "substantial lump on his head." See Guerra Affidavit ¶ 5. However, Guerra was not present the day of the interview. Id. ¶ 4. The only basis for Guerra's belief that the assault occurred is the existence of a lump and Straker's unsubstantiated allegation about the event. Id. ¶ 5 (noting that on January 9, he observed a lump on Straker's head, and "Mr. Straker informed me that he was assaulted by an American Police Officer in the presence of local police"). Thus, Guerra's statement is of little probative value. Moreover, Straker's description of the assault, as he reported it to others, appears to have changed over time. Although he told Guerra that he was "assaulted by an American Police Officer in the presence of local police" -- and hence, the lump -- he later apparently told Dr. Arden that "the FBI agent reached across the table and struck him with a fist one time in his face, specifically striking him just above the right side of his upper lip," which caused a laceration. Tr. at 170, 173, 179-80 (emphasis supplied). He also added a new dimension to the alleged assault, alleging that the lump on the crown of his head was caused by a "constable" -- presumably, then-Constable Lucas -- who "struck him twice on the top and the right rear of his head with a flashlight." Id. at 170. But Guerra's affidavit contains no reference to a laceration on the mouth or an assault by a Trinidad police officer. See Guerra Affidavit ¶¶ 1-8. These inconsistencies in Straker's hearsay statements substantially undermine the credibility of the allegations.

Additionally, other evidence in the record indicates that, contemporaneous with the events in January 2006, Straker attributed the lump to other causes. In particular, according to

26

medical report notes dated January 11, 2006, Straker had complained of a small lump caused by "hitting his head on a louvre" (window blinds). Gov't Ex. 8. Corporal Simmons' memorandum about the incident, also from January 2006, notes that Straker had even asserted "he had these injuries before he was arrested" and wished to decline medical treatment. Gov't Ex. 7. Additionally, the St. George Street Center (where Straker was treated in January 2006) reviewed its records shortly before the motions hearing in this case, and provided a memorandum that confirms there was no report of an assault. Gov't Ex. 9.

Straker introduced medical expert testimony to corroborate his claim of assault, but that evidence ultimately does not advance his claim. Dr. Arden, an expert in the field of forensic pathology and the interpretation of injuries, testified that, based on his medical examination of Straker on January 23, 2008, he determined that Straker's scars are consistent with his allegation that an FBI agent punched him in the mouth and another officer hit him on the head with a flashlight. Tr. at 170-76. But he readily concedes that he has no way of knowing the source of the injury, or how old the injury is. Tr. at 184-85 (acknowledgment by Dr. Arden that he was unable to determine whether Straker's scars were "months or years or even decades" old, and that the injuries were "consistent with numerous explanations" other than the one proffered by Straker). With virtually no evidence to support Straker's claim of an assault -- and substantial credible testimony from four witnesses that the alleged assault did not occur, along with a photograph corroborating that testimony -- the Court finds that Straker was not struck or abused at the January 9, 2006 interview.[17]

---

[17] The Court notes that Clauss testified that Straker told him in passing that Guerra, in fact, told Straker to fabricate the assault. Tr. at 96-97, 123. Straker's counsel contends that it is important to receive live testimony from Guerra to address Clauss's allegation. The Court finds

(continued...)

Straker suggested at the motions hearing that the atmosphere of the January 2006 interview was threatening in other respects. The evidence, however, does not support his contention. He was handcuffed during some part of the interview, but the testimony of Clauss and Cruz indicates that he was uncuffed at some point after Lucas had brought him up from the police station holding cell. Tr. at 56, 76, 86-87, 129. Straker tried to establish that all of the FBI agents were armed, but the testimony actually demonstrated the contrary -- neither Clauss nor Cruz was armed. Id. at 75-76, 128. Freeman, if he was armed, did not have his weapon exposed. Id. And again, the atmosphere of the interview was, by the accounts of all participants, a calm one. It can fairly be described as a slow-moving exchange in which the FBI purposefully let a fairly uneventful interview linger on until it became clear that Straker would not waive his rights, and Straker kept the conversation going at a superficial level to obtain whatever information he could from the FBI. Tr. at 18, 60, 86, 107-08, 143-44, 189-90. Hence, the Court concludes that there was nothing about the January 2006 interview that would have led Straker to believe he should fear abuse from the FBI or Trinidad police.

Straker also contends that the prison conditions in Trinidad are so harsh as to render his waiver of Miranda rights invalid. See Straker Mem. at 13-15 (ECF #188). Guerra, who has personal knowledge of the prison conditions, states that there is extreme overcrowding, terrible food, little hygiene available to prisoners, and conditions giving rise to injuries. Gov't Ex. 11, ¶ 7. Poor prison conditions also have been described by U.S. Department of States reports on

---

[17](...continued)
no need to resolve the issue of Straker's motives for alleging the assault and, hence, no need to question Guerra. See also Order (filed Jan. 26, 2009) (denying Straker's request to conduct deposition of Guerra under Fed. R. Crim. P. 15(a)). For the purpose of resolving Straker's suppression motion, it is sufficient to find that the alleged assault did not occur.

human rights practices in Trinidad for the years 2005 and 2006. See Straker Exs. 9 and 10. The

reports describe the conditions as "harsh," and describe overcrowding resulting in as many as five

prisoners in each 10 by 10 feet cell, "bad food," "denial of prison visits by relatives," outbreaks of

disease, lack of medication, and beatings by prison officers. Id. It is certainly reasonable to infer

from this record that Straker was kept in an overcrowded prison prior to his extradition, with low

quality food and poor hygiene. But there is no basis for inferring that Straker experienced the

harsher conditions of concern raised by Guerra and the State Department -- he does not allege

that he was assaulted while in prison or that he was not provided food or medical treatment.

Although he was placed in isolation for a month or so in early 2006 due to concerns about his

tuberculosis, the record indicates that he was transferred to general population by February or

March of 2006. See Straker Mem. at 7 (ECF #188); Gov't Ex. 10, at 4 (extract of magistrate case

book) (indicating Straker -- defendant "3" - was medically cleared to appear in court by March

2006). In short, the prison conditions, while overcrowded and posing risks to his well-being,

were not so severe that one would conclude that Straker's ability to make a voluntary waiver of

his Miranda rights was impaired.[18] See In re Terrorist Bombings of U.S. Embassies in East

Africa, 552 F.3d at 213-14 (recognizing that harsh prison conditions do not necessarily render

---

[18] Even if the prison conditions made Straker more pliable -- an assertion belied by
Straker's own actions on July 29th -- the Court would be constrained in considering them as part
of the analysis of whether Straker voluntarily waived his Miranda rights or confessed to his
involvement in the hostage taking of Maharaj. The Supreme Court has emphasized that "[t]he
sole concern of the Fifth Amendment . . . is governmental coercion," in contrast to pressures
from other external sources. See Connelly, 479 U.S. at 170. Thus, in the absence of some
coercive police action that exploits a person's mental state, his weakened state of mind arising
from external sources would have limited, if any, weight in the voluntariness analysis. See id. at
164 ("Absent police conduct causally related to the confession, there is simply no basis for
concluding that any state actor has deprived a criminal defendant of due process of law."); United
States v. Bradshaw, 935 F.2d at 299 (observing that Connelly holds that "police coercion is a
necessary prerequisite to a determination that a waiver was involuntary"); United States v.
Hilario-Hilario, 529 F.3d 65, 74 (1st Cir. 2008) (same).

statements involuntary, but instead should be weighed as one data point in the totality of the circumstances).

In short, because Straker initiated communications with the FBI after the initial January 9, 2006 interview -- in a context in which he had indicated he might want to talk and had even taken a business card -- and then voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights at the time he signed the advice of rights form, the Court concludes that the <u>Edwards</u> rule does not bar Straker's July 29, 2007 statement from being admitted at trial.

### C.    Legal Analysis -- Sixth Amendment

Straker's initial motion to suppress rested exclusively on his right to counsel under the Fifth Amendment, and for the reasons set forth above, the Court concludes that the FBI obtained the statement consistent with his Fifth Amendment rights.  At the motions hearing, however, it became apparent that Straker wished to reserve his right to seek suppression based on his separate Sixth Amendment right to counsel.  Tr. at 300-01.  The return of an indictment against him on September 20, 2006 -- well before his July 29, 2007, statement -- had, of course, triggered his right to counsel under the Sixth Amendment in all U.S. proceedings.  <u>See</u> <u>Brewer v. Williams</u>, 430 U.S. 387, 398 (1977).   Counsel then submitted supplemental briefing on whether the FBI's interrogation of Straker during his extradition, without counsel, presented a Sixth Amendment violation.  In particular, the parties addressed whether Straker's waiver of his right to counsel under the Fifth Amendment after being advised of his <u>Miranda</u> rights also waived his separate right to counsel under the Sixth Amendment.

The Supreme Court addressed this very issue in <u>Patterson v. Illinois</u>, 487 U.S. 285 (1988), and held that "[a]s a general matter . . . an accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u> has been sufficiently apprised of the nature of his Sixth

Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." Id. at 296 (citation omitted). In other words, a defendant's knowing and intelligent waiver of Miranda rights also constitutes a knowing and intelligent waiver of his right to counsel under the Sixth Amendment during postindictment questioning. Id. at 292-93. The Supreme Court gave three primary reasons for this conclusion. First, the Miranda warnings make it clear to the accused that he has "a right to consult with an attorney, to have a lawyer present while he [is] questioned, and even to have a lawyer appointed for him if he [can] not afford to retain one on his own," thus conveying "the sum and substance of the rights that the Sixth Amendment provide[s] him." Id. at 293. Second, the Miranda warnings make the accused "aware of the consequences of a decision by him to waive his Sixth Amendment rights during postindictment questioning" by informing him "that any statement could be used against him in subsequent criminal proceedings." Id. Third, the warning advises the accused of "what a lawyer could 'do for him' during postindictment questioning: namely, advise [him] to refrain from making any such [inculpatory] statements." Id. at 294. The lower courts have, since then, consistently applied Patterson's holding that a knowing and intelligent waiver of Miranda rights also waives the accused's right to counsel under the Sixth Amendment. See, e.g., United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007); United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1140 (11th Cir. 2006); United States v. Spruill, 296 F.3d 580, 589 (7th Cir. 2002); United States v. Percy, 250 F.3d 720, 726 (9th Cir. 2001); United States v. Posada-Rios, 158 F.3d 832, 866-67 (5th Cir. 1998); United States v. Muca, 945 F.2d 88, 89-90 (4th Cir. 1991); Riddick v. Edmiston, 894 F.2d 586, 590-91 (3d Cir. 1990).

Straker contends that Patterson should not be applied to his case because it did not

address whether a <u>Miranda</u> waiver sufficed to waive Sixth Amendment rights where a defendant was already represented by counsel or appointed counsel.  <u>See</u> Straker Mem. at 2-8 (ECF #313). He notes that the Supreme Court cautioned that the analysis would shift where a defendant has asserted his right to counsel.  <u>Id.</u> at 7.  But assuming <u>arguendo</u> that Straker's relationship with Guerra constitutes a relationship with counsel protected by the Sixth Amendment,[19] the Court nonetheless finds no merit to his argument that <u>Patterson</u> does not apply.  The passage in <u>Patterson</u> that he relies upon refers to the holding in  <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986), extending the <u>Edwards v. Arizona</u> bright-line rule against further interrogation based on the Fifth Amendment to cover defendants who have invoked their right to counsel under the Sixth Amendment.  <u>See</u> Straker Mem. at 2-7 (ECF #313) (citing <u>Patterson</u>, 487 U.S. at 290-91 & n.3)). In other words, <u>Patterson</u> made clear that its holding could not be used to circumvent the otherwise applicable protections from <u>Edwards</u>.  487 U.S. at 291.  But as discussed in detail above, the <u>Edwards</u>-based prophylactic bar on questioning does not apply here because Straker, on his own, initiated communications with the FBI.  The finding concerning "initiation" under <u>Edwards</u> is equally applicable in the Sixth Amendment context.  <u>See</u> <u>Jackson</u>, 475 U.S. at 626 (recognizing that the <u>Edwards</u> rule permits reinterrogation where the accused initiates communications, and "the same rule" applies in the Sixth Amendment context); <u>United States v. Cain</u>, 524 F.3d 477, 483 (4th Cir. 2008) (noting that the Sixth Amendment "permits a defendant to initiate contact with and give statements to the Government on his own accord"); <u>Garlewicz</u>,

---

[19]  Guerra's representation of Straker was limited to his Trinidad case.  <u>See</u> Guerra Affidavit ¶ 2.  Straker was not represented by counsel in the U.S. proceedings at the time of his extradition.  Moreover, as the government points out, Straker could not have asserted any rights under the Sixth Amendment at the time of his January 2006 interview because he had not then been indicted in the United States.

493 F.3d at 937 ("where the defendant initiates contact . . . he may validly waive his Sixth Amendment rights, even if he is represented by an attorney").

Furthermore, like the petitioner in <u>Patterson</u>, Straker has not identified what further information about his Sixth Amendment rights the FBI could have provided beyond what was described in the <u>Miranda</u> warnings he received. And under <u>Patterson</u>, the <u>Miranda</u> warnings provided by the FBI sufficiently apprised Straker of "the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on [that] basis will be considered a knowing and intelligent one." <u>Patterson</u>, 487 U.S. at 296.

## II.    Sealey's Motion to Suppress

Sealey moves to suppress two statements that were taken from him on August 8, 2006 -- one to the Trinidad police and the other to FBI. <u>See</u> Sealey Mem. at 3-5 (ECF #223); Sealey Supplemental Mem. at 2-3 (ECF #234); Gov't Ex. 18 (Trinidad record of Sealey interview); Gov't Ex. 21 (FBI summary of Sealey interview). He contends that his statement to the Trinidad police was taken without any <u>Miranda</u> warnings, which he contends were required in light of the alleged participation by the FBI in that interview. Sealey Mem. at 4 (ECF #223). He also suggests that his waiver of rights with respect to the FBI was not made knowingly and intelligently. <u>Id.</u> And he contends that, in any event, the statements should be excluded because he made them involuntarily. <u>Id.</u> at 5. The Court sets forth its factual findings and legal analysis below.[20]

_____

[20]    The Court draws primarily from the testimony of the two Trinidad officers at the August 8, 2006 interview -- Gosyne and Pinder -- and FBI Agent Freeman for these findings. The Gosyne and Pinder testimony refers to the police station diary extracts submitted as Gov't Exhibits 19 and 19-A, which require the following explanation. Gosyne created extracts of the station diary in preparation for the motions hearing by writing down word for word the relevant

(continued...)

## A. Factual Findings

Sealey was arrested by Trinidad police the morning of August 8, 2006, and detained in the holding cell at the Arouca police station. Tr. at 69-72, 264, 270-71. Gosyne was walking through the holding cell that afternoon, when Sealey stopped her at about 5:00 p.m. to ask her for a drink of water. Id. at 226-27; Gov't Ex. 19 (station diary extract, entry no. 30). In response, she brought him water, at which point he said that he wanted to speak with her about a kidnapping. Id. at 226-27. She identified herself as a Trinidad police officer, and cautioned him as to his rights under Trinidad law, advising him that he was not obliged to say anything and that his statements would be taken down in writing and given in evidence. Tr. at 227. Sealey responded that he still wished to talk because he wanted to clear himself. Id. at 227-28. Gosyne advised Sergeant Ramdeen of Sealey's request, and Ramdeen had Sealey brought up to his office on the second floor of the station. Id. at 228-29. Ramdeen also requested the presence of a Justice of the Peace. Id. at 229. No questioning took place while the police waited for a Justice of the Peace to arrive. Id.

Justice of the Peace Asquith Clarke arrived around 7:00 p.m., and was immediately given time to speak privately with Sealey. Id. at 229; Gov't Ex. 19 (station diary extract, entry no. 31). After that meeting, the Justice of the Peace advised the police that Sealey wanted his father, Hugh David Sealey, to be present for his statement. Tr. at 230. Pinder was sent out to find Sealey's father, and returned with him at about 7:45 p.m. Id. at 230, 265-66; Gov't Ex. 19 (station

[20](...continued)
entries from the original station diary. See Gov't Ex. 19. The government also submitted a photocopy of those entries from the original station diary, but the photocopy is not easily readable. See Gov't Ex. 19-A. Because Gosyne's handwritten reproduction is the more legible version (Ex. 19), the Court cites to that version of the extracts. The same entries, however, can be found on Gov't Ex. 19-A.

diary extract, entry no. 34). Sealey, his father, and the Justice of the Peace then had a private meeting in a cubicle at the station. Tr. at 230-31. The handwritten certification of the Justice of the Peace states that, during that meeting, he asked Sealey questions to confirm that Sealey was making the statement knowingly and voluntarily, and Sealey's responses confirmed that he was:

> I . . . asked the suspect if he was threatened or abused or promised anything to give the statement and he said no. He was giving the statement on his own free will. I also told him he was not obliged to give any statement and he said he wanted to give a statement and he wanted the police to write the statement. I then recalled the police officers to the room.

Gov't Ex. 18 at 237; Tr. at 241-42. The Trinidad police then got ready to commence the interview.

While this was happening, Freeman arrived, having been notified by Clauss earlier that day that Sealey had been arrested. Tr. at 192-93. Pinder and Gosyne did not, however, include Freeman in their preparations, having had no discussions with him about the investigation before that day. Id. at 257, 272-73. Freeman was also excluded from the interview conducted by the Trinidad police, although he was allowed to remain in a nearby adjacent cubicle over 10 feet away and could hear the interview taking place. Id. at 196. None of the Trinidad officers had consulted him about the interview before it was scheduled, nor did they discuss their plans for the interview once Freeman arrived. Id. at 221, 257, 273. Hence, Freeman did not make any suggestions to the officers about any areas of inquiry. Id.

In the presence of Sealey's father, the Justice of the Peace, and Sergeant Pinder, Gosyne began the interview of Sealey at about 8:15 p.m., and concluded the interview at 9:45 p.m. Id. at 242-43. Gosyne made a handwritten transcript of the interview and also acted as the questioner. Id. at 237-39. She began by reading him his rights as required by the Trinidad "Judges' Rules," and asked him to sign the following statement: "I, Michael Bourne, also known as Christopher

Sealey and Boyie, wish to make a statement. I want someone to write down what I say. I have been told that I need not say anything unless I wish to do so and that whatever I say may be given in evidence. I have also been told that I have the right to retain a legal adviser." Tr. at 237; Gov't Ex. 18, at 230. Sealey said that he understood, and then signed as "Christopher Bourne" -- one of his aliases -- and his father and the Justice of the Peace also signed, bearing witness to his signature. Tr. at 237, 242; Gov't Ex. 18, at 230.

Sealey then proceeded to describe his involvement in the Maharaj kidnapping, with Gosyne asking him to stop periodically so that she could write everything down. Tr. at 239. His father and Justice of the Peace Clarke remained in the cubicle for the full statement, along with Pinder and Gosyne. Id. Gosyne noted that Sealey wanted to clear his name about the murder of Maharaj, in contrast to the kidnapping. Id. at 244. When he finished his narrative, Gosyne followed up with specific questions, which Sealey answered, all of which were also transcribed by Gosyne. Id. at 239. She occasionally made mistakes, which she noted with a cross mark and asked him to place his initials -- "CB" -- in the margin. Id. at 255, 260-61. Gosyne then read the entire statement back to Sealey, and where Sealey noted mistakes, his corrections were noted, and he placed his signature next to the correction. Id. After that process concluded, Gosyne asked him to make the following statement in his own handwriting: "The above statement has been read to me, and I have been told that I can correct or add anything I wish. This statement is true. I have made it of my own free will." Id. at 240-41. Sealey agreed to do so, and his father and the Justice of the Peace signed as well. Id. at 240-41, 269.[21] Sealey's demeanor during the

---

[21] Gosyne's procedure for taking Sealey's statement by writing it in her own hand and requesting handwritten acknowledgments and initials in multiple sections may, at first glance,

(continued...)

interview was cooperative and coherent.  Tr. at 268.

The Justice of the Peace then added his handwritten certification as to the circumstances of the interview, summarizing his initial private meeting with Sealey and his father and Sealey's waiver of rights, and then confirming that Sealey had been read the full statement in the presence

---

[21](...continued)
sound like a departure from protocol, and Sealey suggests there was something improper about it.  See Sealey's Mem. at 5 (ECF #223) (describing the taking of the statement as "carefully orchestrated," noting that it was "handwritten by the arresting officer").  But the record shows that the process closely conforms to the requirements of the Judges' Rules, which are the guidelines governing police treatment of suspects in custody.  Tr. at 10.  That document provides:

> (a) If a person says that he wants to make a statement he shall be told that it is intended to make a written record of what he said.  He shall always be asked whether he wishes to write down himself what he wants to say; if he says that he cannot write or that he would like someone to write it for him, a police officer may offer to write the statement for him.  If he accepts the offer the police officer shall, before starting, ask the person making the statement to sign, or make his mark to, the following:  "I, ..........................., wish to make a statement.  I want someone to write down what I say.  I have been told that I need not say anything unless I wish to do so and that whatever I say may be given in evidence."

> (b) Any person writing his own statement shall be allowed to do so without any prompting as distinct from indicating to him what matters are material.
> . . . .

> (d) Whenever a police officer writes the statement, he shall take down the exact words spoken by the person making the statement, without putting any questions other than such as may be needed to make the statement coherent, intelligible, and relevant to the material matters; he shall not prompt him;

> (e) When the writing of a statement by a police officer is finished the person making it shall be asked to read it and to make any corrections, alterations, or additions he wishes.  When he has finished reading it he shall be asked to write and sign or make his mark on the following Certificate at the end of the statement: "I have read the above statement and I have been told that I can correct, alter, or add anything I wish.  This statement is true.  I have made it of my own free will."

Gov't Ex. 3, at 385-86.  Nothing in the Judges' Rules implies or indicates that Gosyne's role in writing the statement for Sealey should be viewed with suspicion.

of his father before making the handwritten certification that it was correct.[22] Id. at 242; Gov't

Ex. 18 at 237-38. The interview ended at 9:45 p.m., having lasted about 90 minutes. Tr. at 24-

43. Gosyne then asked Sealey whether he wanted to have dinner -- according to the station diary

extract, he had refused an earlier offer of dinner at 6:00 p.m. Gov't Ex. 19 (station diary extract,

entry no. 41). He again refused, stating that he was not hungry. Id.

At that point, the Trinidad police then allowed Freeman to conduct his interview of

Sealey. Tr. at 197. Freeman asked Sealey if he wanted to take a restroom break or wanted water,

but Sealey declined. Id. Freeman began the interview by advising Sealey of his rights under

American law, using an "international advice of rights" form. Id. at 197. That form advises a

suspect of his Miranda rights, but explains that appointment of counsel cannot be guaranteed by

the FBI in a foreign country for a person not in U.S. custody. Gov't Ex. 20. It states in full:

> We are representatives of the U.S. government. According to our laws, you are
> entitled to certain rights. Before we ask you any questions, we want to be certain
> that you understand such rights.
>
> You do not have to speak to us nor do you have to answer any questions. Even though
> you may have spoke[n] to the Trinidad authorities, you do not have to speak to us right
> now. If you do speak to us, everything that you say can be used against you in a court of
> law, in the United States or anywhere else.
>
> In the United States, you would have the right to seek advice from an attorney before we
> asked you any questions and to have an attorney with you during interrogation. If you
> were in the United States and could not afford an attorney, you would be provided an
> attorney at no cost before submitting any questions, if you so desired. Since you are not
> in our custody, nor are we in the United States, we cannot assure that you will have
> access to an attorney, nor can we assure that you will be provided with an attorney before

---

[22] The Justice of the Peace certification states, inter alia: "[Gosyne] asked him if he was
satisfied with what she wrote as she read the statement to the suspect in the presence of his
father. He said he was satisfied that it correctly recorded, and he signed and date[d]. Along with
PC Pinder, the suspect and myself signed and dated it. The suspect then wrote a certificate from
the Judges' Rule[s] to which again he signed and dated it. His father did likewise, PC Pinder and
I did likewise." Tr. at 241-42; Gov't Ex. 18.

we ask you any questions, or when we are asking such questions.  If you wish to have an attorney but Trinidad authorities do not allow you access to one, or if they refuse to provide you an attorney at this time, you may opt not to speak to us.  If you decide to speak to us without an attorney present, you reserve the right to decline to answer our questions at any time.

Moreover, you should understand that if you choose not to speak to us, that fact may not be used as evidence against you in a court of law in the United States.

It ends with the following acknowledgment and waiver of rights:

I have read this notice of my rights and understand what my rights are.

I am prepared to give a statement and to answer questions.

I do not wish to have an attorney at this time.

I understand and I know what I am doing.

I have received no promises or threats nor have I been subject to pressure or coercion of any sort.

Id.  Freeman read him the form, and provided a copy of the form to Sealey to read.  Tr. at 199. Sealey then signed the document "Christopher Bourne" and initialed each line of the waiver section.  His father and Pinder were both still with him for the advice of rights, and they each signed as witnesses.  Id. at 216, 269-70; Gov't Ex. 20.  Pinder then left, but Sealey's father remained for the rest of the interview.  Tr. at 216, 272-73.  The interview proceeded without interruption.  Sealey did not ask to stop the interview, nor did he appear to be in distress or discomfort.  Id. at 200.  The interview concluded around 10:30 or 11:00 p.m. that night, taking a total of 30 minutes to an hour.  Id. at 214 (indicating that waiver of rights was signed at 10:45 p.m.); Gov't Ex. 19 (station diary extract, entry no. 42) (noting that Freeman left the police station at 10:30 p.m.).

Sealey was indicted in the United States the next month, on September 20, 2006.  On July 27, 2007, the Trinidad government issued a warrant surrendering Sealey for extradition to the

United States to face the hostage taking charges in this case.  See Gov't Ex. 23.  Sealey was

transferred to the custody of the FBI on July 29, 2007, for extradition to the United States, along

with Straker and two other co-defendants. Tr. at 100-01.

**B.      Fifth Amendment Analysis**

**1.      Sealey's Statement to the Trinidad Police**

Sealey contends that his statement to the Trinidad police on August 8, 2006 should be

suppressed on the ground that the Trinidad police were required to provide Miranda warnings

under the "joint venture" doctrine, but failed to do so, and that, in any event, applying due

process standards, the statements should be excluded as involuntary.  The Court recognized in

Section I.B above that the Fifth Amendment privilege against self-incrimination protects

nonresident aliens facing a criminal trial in the United States where the questioning is conducted

by United States authorities abroad.  However, when a person makes a statement to foreign

police officers abroad, rather than U.S. officers, two additional issues regarding the reach of the

Constitution may arise.

The first is the threshold issue of the applicability of Miranda to statements obtained by

foreign officers acting abroad.  Such statements generally are not governed by Miranda unless,

under the "joint venture" doctrine, United States law enforcement agents actively participate in

the questioning of the defendant or the foreign officials act as agents or virtual agents of the

United States.[23]  See  In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 203

(citing Yousef, 327 F. 3d at 145-46); United States v. Abu Ali, 528 F.3d 210, 228-29 (4th Cir.

2008); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003).  The second issue is

---

[23]  There is not, however, a consensus on the level of cooperation necessary to support a
finding of a "joint venture."  See  Yousef, 327 F.3d at 146.

whether -- in the absence of any U.S. involvement -- the admissibility of a defendant's statement should be assessed under the Due Process Clause by the traditional "voluntariness" standard or a "shocks the conscience" standard, or instead is admissible without regard to either standard. See United States v. Karake, 443 F. Supp. 2d 8, 52-53 & nn.73-74 (D.D.C. 2006) (discussing whether the standard is "shocks the conscience" or voluntariness, suggesting the latter is correct); Abu Ali, 528 F.3d at 231-33 (applying a voluntariness standard); United States v. Wolf, 813 F.2d 970, 972 n.3 (9th Cir. 1987) (questioning whether constitutional protection against involuntary confessions applies to confessions coerced by foreign police in light of Colorado v. Connelly, 479 U.S. 157 (1986)). Here, the government does not press for a "shocks the conscience" standard, arguing instead that Sealey's statements to the Trinidad police satisfy the traditional voluntariness standard; hence, the Court will evaluate his statements on that basis. See Gov't Opp. at 18 (ECF #258).

The Court expressed doubts prior to the June 2007 trial of another defendant, David Suchit, that the FBI's information-sharing with Trinidad during the course of their parallel investigations of the Maharaj kidnapping amounted to a joint venture, but left the question unresolved. See Suchit, 480 F. Supp. 2d at 57 & n.25. The Court has now reviewed sufficient evidence to conclude that, at least as to the interview of Sealey on August 8, 2006, there was no joint venture. Under Sealey's theory, there was a joint venture because the Trinidad police and the FBI conducted a single joint interview that day, rather than two separate interviews, and were working together in many other aspects of the investigation. See Sealey's Supp. Mem. at 2-3 & n.4 (ECF #234). But there is simply no evidence to support his "single interview" theory. The testimony, outlined supra at 33-39, overwhelmingly established that there were two distinct interviews: the first one with the Trinidad police -- that is, Constables Gosyne and Pinder, with

Sealey's father and the Justice of the Peace also present, but excluding Freeman; and the second with Freeman and Sealey's father (with Pinder departing after Sealey signed the FBI waiver of rights). Furthermore, the Trinidad police and Freeman were not acting jointly with respect to the investigation of Sealey at the time the interview took place. The FBI did not participate in Sealey's arrest on August 8, 2006, nor was it even remotely involved in setting up Sealey's interview with the Trinidad police. More significantly, Freeman was not allowed to participate in the Trinidad officers' interview of Sealey, observe the interview, or submit any questions. He was only permitted to conduct his own separate interview. Whatever information-sharing or cooperation might have occurred with respect to other defendants, there is nothing to support a finding that the Trinidad police and the FBI were acting "jointly" on August 8, 2006, under even a broad view of the "joint venture" standard. Because there was no joint venture with respect to the investigation of Sealey, <u>Miranda</u> does not determine the admissibility of Sealey's statement to the Trinidad police.[24]

The Court next considers whether Sealey's statement to the Trinidad police may be admitted at trial consistent with due process. The evidence demonstrates overwhelmingly that

---

[24] Had there been a joint venture with respect to investigating Sealey, <u>Miranda</u> would not preclude the admissibility of Sealey's statement to the Trinidad police because they provided warnings that were functionally equivalent to those required by <u>Miranda</u>. Gosyne testified that she advised Sealey of his right to remain silent and his right to retain a legal adviser, and also informed him at least twice that his statements could be used in evidence against him. Sealey signed a statement acknowledging that he had been so advised, and then voluntarily, knowingly, and intelligently waived his rights, as discussed in more detail above. Although the warnings did not include any advice on appointment of counsel, no such warnings were required because appointment of counsel to the indigent during interrogation is not required under Trinidad law. <u>See</u> <u>In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 552 F.3d at 198-99 ("If the suspect chooses to make a knowing and voluntary waiver of his rights after a warning adapted to the circumstances of questioning overseas and chooses to speak with a U.S. agent, then neither the Fifth Amendment nor <u>Miranda</u> will bar the admission of his statement at trial.").

Sealey voluntarily made the statement. First, as noted above, Sealey reached out to Gosyne requesting to make a statement, motivated by a desire to clear his name with respect to allegations concerning the murder aspect of the offense. Second, the police provided multiple cautions to Sealey about his right to remain silent before he made his statement -- first, when Sealey requested an opportunity to make a statement from his holding cell, then from the Justice of the Peace, and finally, a caution immediately prior to the taking of his statement. Third, Sealey requested the presence of his father, which was promptly granted. Fourth, the Justice of the Peace met privately with Sealey and his father prior to the interview to ensure that Sealey was acting voluntarily. During that meeting, Sealey denied that he had been threatened or abused and, when told that he was not required to give a statement, responded that he "wanted to give a statement" and he "wanted the police to write the statement." Lastly, at the end of the interview, Sealey was given an opportunity to make corrections to the statement -- which he did -- and then penned in his own handwriting that "I have made [the statement] of my own free will." The Justice of the Peace then provided a certification further attesting to the voluntariness of the interview. The duration of the interview was not unusually long -- 90 minutes -- and he was offered food prior to the interview, and then again at the end. All of these circumstances are compelling indications that Sealey voluntarily provided his statement.

Sealey's primary contention in support of a claim of coercion is based on the presumption that he was held in jail for about a week before making the statement. See Sealey's Mem. at 3-5 (ECF #223); Sealey Supp. Mem. at 2 (ECF #234). But there was no evidence to support that claim of prolonged detention. All of the evidence -- testimony from Lucas and Pinder, as well as the original station diary extract -- demonstrates that Sealey was arrested the day of the interview -- August 8, 2006. Sealey also contends the statement should be considered involuntary because

43

he requested counsel, but instead was provided access only to his father, whom he calls "a known drug abuser." Sealey Mem. at 3 (#223). But the evidence does not suggest that Sealey requested an attorney; it indicates only that he requested the presence of his father, which was promptly granted.[25] Sealey's brief also alleges that he cannot read or write. Id. at 3. Again, there was no evidence to support that allegation, and some testimony indicating that he can, indeed, read, considering that he wrote the Judges' Rules certification in his own hand. But even if the Court assumes Sealey cannot read, it changes nothing -- Gosyne testified that she read out loud the cautions concerning his legal rights. Based on the totality of the circumstances, then, the Court finds that the evidence overwhelmingly establishes that Sealey provided his statement to the Trinidad police voluntarily. Therefore, Sealey's motion to suppress his statement to the Trinidad police will be denied.

### 2. Sealey's Statement to the FBI

Sealey's motion to suppress the FBI statement is premised on his contention that there was only one un-Mirandized interview -- a factual contention that has no support in the evidenitary record. See Sealey's Supp. Mem. at 2 n.4 (ECF #234). Hence, there is little left of his argument that his statement to the FBI should be suppressed. Nonetheless, the Court has conducted a plenary review of the evidentiary record and examined the relevant case law, and concludes that there is no basis for suppressing Sealey's statement to the FBI.

Sealey was presented with the standard FBI international advice of rights form, which advises a defendant of his Miranda rights before questioning, adapted to reflect the circumstances

---

[25] Furthermore, there is no evidence to indicate that his father was a drug addict. But even if that were true, Sealey requested his father's presence, so it is unclear what bearing that would have on the motion.

of the questioning taking place abroad.  The Second Circuit has recently held that the international advice of rights form substantially complies with the cautions required by <u>Miranda</u> and contains permissible adaptations to describe accurately the availability of counsel to a detainee held by a foreign authority.  <u>In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 552 F.3d at 181, 206-09 (reviewing validity of virtually identical international advice of rights notification).  The court noted that the first two warnings in the advice of rights form -- the right to remain silent and the introduction at trial of any statements made thereafter -- are "entirely consistent with the text and teaching of <u>Miranda</u>."  <u>Id.</u> at 206.  With respect to the presence and appointment of counsel, the court explained that the Supreme Court has made clear that, even in a case arising in a purely domestic setting, government officials are permitted to -- indeed, required to -- "'accurately describe[] the procedure for the appointment of counsel' under applicable law," even if local procedures would not grant them ready access to an attorney.  <u>Id.</u> at 207-08 (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 204 (1989)).  "If, under those procedures, 'the police cannot provide appointed counsel, <u>Miranda</u> requires only that the police not question a suspect unless he waives his right to counsel.'"  <u>Id.</u> (quoting <u>Duckworth</u>, 492 U.S. at 207-08).  Because the international advice of rights form advises suspects abroad that the United States cannot assure their access to an attorney -- and at the same time, advises a suspect that he may therefore choose not to speak -- it is a permissible variation of <u>Miranda</u>.  552 F.3d at 208.  For the same reasons, this Court agrees that the international advice of rights form presented in this case -- virtually identical to the one reviewed by the Second Circuit -- served to adequately advise Sealey of his rights under <u>Miranda</u>.

Furthermore, the record clearly establishes that Sealey voluntarily, knowingly, and intelligently waived those rights before making his statement to Freeman, who read the form out

loud to Sealey in the presence of Sealey's father and Pinder. Sealey signed the waiver, and his

father and Pinder signed as witnesses. The other circumstances of the interview indicate that

Sealey was quite conscious of his decision to make a statement about the Maharaj kidnapping, as

reflected by his reaching out to Gosyne with a request to make a statement in order to clear his

name with respect to any allegations of murder. Sealey was, moreover, in no physical discomfort.

He had been offered food at 6:00 p.m. and again at 9:55 p.m., declining both times. Before his

interview with Freeman began around 10:00 p.m., Freeman asked Sealey if he needed a restroom

break or water, which Sealey declined. His interview with Freeman was relatively short,

probably less than an hour. Together with the previous interview, the questioning, collectively,

was about three hours. In short, Sealey voluntarily waived his rights, with a full understanding as

to his legal rights. Therefore, the Court will deny Sealey's motion to suppress his statement to

the FBI.

### III. Defendants' Motion for Return to Trinidad

Relying on the same factual allegations in support of his suppression motion, Straker

contends that he should be returned to Trinidad on the ground that his consent to extradition was

not voluntary -- that is, he had no real freedom of choice because he had been abused by Trinidad

police and the FBI, and he had been subjected to harsh conditions of confinement. See Straker

Mem. at 2-4 (ECF #210). In response, the government contends that the Supreme Court and this

Circuit have rejected such challenges to extradition under more egregious circumstances --

forcible abduction from one's home country -- and thus the request for relief should be denied.

See Gov's Opp. at 4-7 (citing United States v. Mejia, 448 F.3d 436 (D.C. Cir. 2006), and United

States v. Alvarez-Machain, 504 U.S. 655 (1992)). The Court notes that Sealey has summarily

joined in Straker's motion -- which puts him in an awkward procedural posture because the

relevant factual allegations are specific to Straker.[26]  See Sealey's Second Mot. to Adopt and Join

Motions (ECF #222).  Nonetheless, the Court will consider the motion as applicable to both

defendants, and for the reasons stated below, will deny their request for return to Trinidad.

This Court considered substantially the same request made with respect to the first

defendant tried in this case, David Suchit, and determined that a defendant has no right to return

to his country of origin where his extradition has not violated the terms of the relevant extradition

treaty.  See Suchit, 480 F. Supp. 2d at 49-51.  The Court applies that same analysis here.  The

Supreme Court has made clear that a court's jurisdiction over a defendant from another country

will depend primarily on whether the circumstances of the defendant's transfer to the United

States violated the terms of the relevant treaty, rather than on the degree of force involved in

obtaining custody.  Alvarez-Machain, 504 U.S. at 667-70.  The terms of the treaty are paramount:

"If [the court] conclude[s] that the [t]reaty does not prohibit [defendant's transfer], the rule in Ker

applies, and the court need not inquire as to how respondent came before it." Id. at 661-62.  The

Supreme Court has further explained that, under the "rule in Ker" -- referring to Ker v. Illinois,

119 U.S. 436 (1886) -- "'[t]he power of a court to try a person for crime is not impaired by the

fact that he had been brought within the court's jurisdiction by reason of a forcible abduction'" --

or, presumably, by other means involving some lesser degree of force -- absent a violation of the

treaty.  Alvarez-Machain, 504 U.S. at 661 (quoting Frisbie v. Collins, 342 U.S. 519, 522 (1952)).

The Court reasoned that due process of law is satisfied when the defendant is provided "a fair

trial in accordance with constitutional procedural safeguards." Id. at 662.  Thus, in Alvarez-

_____

[26]  Indeed, Sealey has not explicitly stated that he consented to extradition or that he did
so under circumstances indicating coercion.  However, because Sealey's motion is based entirely
on Straker's motion, the Court will presume that Sealey consented to extradition, although the
record is silent on this point.

Machain the Supreme Court held that a defendant's forcible abduction from Mexico by DEA agents did not prohibit his trial in the United States, emphasizing that no term of the extradition treaty with Mexico had been violated. Id. at 670.

Following Alvarez-Machain, this Circuit has held that where a defendant was transferred to the United States under an informal cooperative arrangement with Panama, he was properly tried here. See Mejia, 448 F.3d at 443. The court found it dispositive that nothing in the relevant extradition treaty prohibited the transfer; thus, the rule of Ker applied, and the jurisdiction of the trial court over the defendant was affirmed. See Mejia, 448 F.3d at 443.

This Court therefore first considers whether there was a violation of the United States extradition treaty with Trinidad. See generally Extradition Treaty with Trinidad and Tobago (signed Mar. 4, 1996, entered into force Nov. 29, 1999), Treaty Doc. 105-21, published at 1996 WL 910005. Defendant has not identified a violation of any provision of this extradition treaty nor can the Court discern one. See Straker Mem. at 1-4 (ECF #210). Indeed, the treaty states in Article 15: "If the person sought consents to surrender to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings." Here, Straker concedes that he consented to extradition. See Straker Mem. at 2 (ECF #210).

Straker contends that the Court must look behind the face of his consent, and determine whether it was voluntary, suggesting that the Court apply Fourth and Fifth Amendment case law on voluntariness with regard to searches and confessions. See Straker Mem. at 3-4 (ECF #210). He further urges that his consent was not voluntary because his overall "fear for his well-being" resulted in a lack of "genuine freedom of choice." Id. at 2.

It is not at all clear in light of Alvarez-Machain and Mejia that the Court is free to superimpose the voluntariness standards of Fourth or Fifth Amendment case law on the

extradition treaty, particularly in light of the Supreme Court's refusal to create implied terms

without a solid foundation for the term in "the practice of nations regarding extradition treaties."

504 U.S. at 667.   Moreover, superimposing an imprecise "totality of the circumstances" standard

would be inconsistent with the Supreme Court's observation that "[e]xtradition treaties exist so as

to impose mutual obligations to surrender individuals <u>in certain defined sets of circumstances</u>."

<u>Id.</u> at 664 (emphasis supplied).  It bears noting, as well, that it would be fundamentally at odds

with the core presumption of <u>Alvarez-Machain</u> -- again, a forcible abduction case -- that the

express terms of a treaty trump any concerns about the voluntariness of a defendant's transfer to

the United States.  <u>See</u> <u>Mejia</u>, 448 F.3d at 443 (emphasizing that, in <u>Alvarez-Machain</u>, the use of

force in the context of a forcible abduction was not prohibited considering that the treaty "'sa[id]

nothing about the obligations of the United States and Mexico to refrain from forcible abductions

. . . or the consequences under the Treaty if such an abduction occurs.'") (quoting 504 U.S. at

663).

 Even if the extradition treaty allowed the Court to look behind Straker's consent, the

Court finds that the totality of the circumstances indicates that Straker's consent to extradition

was voluntary.  As detailed above, the Court has reviewed the factual record and determined that

there is no basis to credit Straker's claim that he was physically abused by either the FBI or the

Trinidad police.  The Court also has considered Straker's claim that harsh conditions of

confinement rendered him incapable of making a voluntary statement on the day of extradition,

and concluded that, although prison conditions were likely overcrowded and lacking in hygiene,

there is no evidence that the conditions of Straker's confinement were so seriously deficient as to

overcome his ability to exercise his free will.  The Court also observes that on the day of

extradition, he refused to have his photograph taken on multiple occasions.  This kind of

independent decisionmaking confirms that his will was not so overborne that he lacked the ability to make voluntary choices.  See United States v. Hall, 969 F.2d 1102, 1108 (D.C. Cir. 1992) (actions that "demonstrate a capacity to make autonomous decisions" when police are present indicate a defendant has the ability to make voluntary choices).  Looking at the totality of the circumstances, then, the Court finds that Straker freely and voluntarily consented to extradition.  Straker's motion for return to Trinidad will be denied, and to the extent the motion is applicable to Sealey, it will also be denied.

## CONCLUSION

For the foregoing reasons, the Court will deny Straker's motion to suppress his statement to the FBI and Sealey's motion to suppress his statements to the Trinidad police and the FBI.  The Court also will deny Straker's and Sealey's motion for return to Trinidad. A separate order will be issued herewith.

_____
/s/
JOHN D. BATES
United States District Judge

Dated:  February 10, 2009